**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Donald J. BLANDFORD, Defendant–**
**Appellant.**

**No. 93–6011.**

United States Court of Appeals,
Sixth Circuit.

Argued April 28, 1994.

Decided Sept. 7, 1994.

Before NELSON, Circuit Judge; GUY,* Senior Circuit Judge; and QUIST, District Judge.**

GUY, Senior Circuit Judge, delivered the opinion of the Court. NELSON, Circuit Judge (pp. 712–14), delivered a separate concurring opinion. QUIST, District Judge (pp. 714–15), delivered a separate opinion concurring in part and dissenting in part in Judge GUY's opinion, and concurring in Judge NELSON's opinion.

RALPH B. GUY, Jr., Senior Circuit Judge.

Following a jury trial, defendant was convicted of (1) extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951; (2) racketeering, in violation of the federal RICO statute, 18 U.S.C. § 1962(c); and (3) making false statements to federal investigators, in violation of 18 U.S.C. § 1001. On appeal, defendant challenges these convictions as well as his sentence. For the following reasons, we affirm.

## I.

This case arises out of an FBI investigation into public corruption in Kentucky. The investigation, dubbed "Operation BOPTROT," focused on certain members of the Kentucky General Assembly who were suspected of extorting cash payments in exchange for assurances that they would take a particular stance on legislation pertaining to the horse racing industry. Initiated in September 1990, Operation BOPTROT ultimately ensnared several public officials, including Donald J. Blandford, Speaker of Kentucky's House of Representatives. The circumstances that led to Blandford's conviction are as follows.

### A. Hobbs Act Violations

At all times relevant to this appeal, Riverside Downs, a harness racing track located in Henderson, Kentucky, cooperated with the FBI. As part of its probe, the FBI directed Riverside Downs to hire John "Jay" Spurrier

Terry Cushing, Asst. U.S. Atty. (briefed), Stephen G. Frye, Asst. U.S. Atty., Stephen B. Pence, Asst. U.S. Atty. (argued), Louisville, KY, Edwin J. Walbourn, III, Office of U.S. Atty., Covington, KY, for U.S.

Morton Holbrook, Allen W. Holbrook (argued and briefed), Holbrook, Wible, Sullivan & Helmers, Owensboro, KY, for Donald J. Blandford.

* The Honorable Ralph B. Guy, Jr. assumed senior status on September 1, 1994.

** Honorable Gordon J. Quist, United States District Court for the Western District of Michigan, sitting by designation.

ostensibly to promote the track's interests in the state assembly.[1] Spurrier was a logical choice; a prominent lobbyist from Frankfort, Kentucky, he chaired Kentucky's Harness Racing Commission. On Spurrier's advice, Riverside Downs then hired William McBee. McBee, also a lobbyist, was a former state representative who had recently lost a bid for re-election.

An important part of Spurrier's and McBee's work on behalf of Riverside Downs was their effort to stifle any proposed legislation that would restrict the track's ability to simulcast thoroughbred races. In particular, Riverside Downs, like other harness racing tracks, was concerned about the possible enactment of "breed-to-breed" legislation. Under such legislation, race tracks would be able to simulcast only those races involving similar breeds of horses.

Spurrier became aware of Operation BOPTROT after he and McBee had decided to assist Riverside Downs's effort to block any proposed breed-to-breed legislation. Spurrier agreed to cooperate with the investigation and subsequently informed the FBI that Blandford, among others, would be willing to accept money in exchange for his opposition to breed-to-breed legislation.[2] Spurrier added, however, that Blandford would accept payment only from McBee, who, at the time, was still unaware of the investigation (not to mention Spurrier's complicity). Although the FBI did not immediately attempt to bring McBee into the fold, McBee nevertheless became an unwitting participant, assisting the investigation on at least three occasions by passing FBI money to Blandford.

The first such occasion took place in late January 1992 while various lobbyists, state legislators (including Spurrier, McBee, and Blandford), and their guests were on a trip to Florida. Similar trips, which were financed by various interest groups (the harness racing industry among them), had been taking place on an annual basis for a number of years. Prior to leaving on the trip, Spurrier and McBee discussed the possibility of soliciting, by way of an illegitimate payment, Blandford's assistance in defeating breed-to-breed legislation. To this end, McBee was provided with $500 by Chris Koumas, a Riverside Downs representative who was cooperating with the investigation. Once in Florida, McBee handed the money over to Blandford. In so doing, McBee described the payment as "walking around" money. He did

---

1. At this time, Spurrier was unaware of the ongoing federal investigation. Indeed, Spurrier would not find out about Operation BOPTROT until January 7, 1992, when the FBI confronted him with evidence that he had bribed the governor's nephew, Bruce Wilkinson, with $20,000. Spurrier had made the bribe in connection with a dispute between the Harness Racing Commission and its counterpart, the Thoroughbred Racing Commission, over the allocation of intertrack wagering dates between Riverside Downs and Ellis Park, a nearby thoroughbred track. Pursuant to state law, the dispute was to be referred to an arbitrator selected by the governor. By paying the bribe, Spurrier had hoped to ensure that an arbitrator favorably disposed to Riverside Downs's position would be assigned to resolve the dispute.

2. At trial, as the following exchange from his direct examination reveals, Blandford freely admitted that he had made something of a habit out of accepting cash from lobbyists:

Q. I believe you were quoted as saying you don't think there is anything wrong with taking money from lobbyists as long as there is nothing, no promises made; is that right?
A. That's, that's pretty accurate, yes.
Q. You said—
A. And again, now, it's in the mind of the beholder, I guess, whether it's wrong, but I think we are talking about what is legal here.
Q. Okay. We, I'm going to get to that in a second. But didn't you say after court the other day to the press, lobbyists can take, or I can take as much money from a lobbyist, it doesn't make any difference, as long as I don't promise anything in return, there is nothing wrong with that. Didn't you say that?
A. I said it's not a bribe.
Q. It's not a bribe?
A. Yes.
Q. Okay, in your mind. And there is nothing wrong with it?
A. No.
Q. As a matter of fact, you did it plenty of times, didn't you?
A. There is nothing illegal [ ] about it.
Q. And did it plenty of times, took money from a lobbyist when you didn't promise them anything?
A. Yeah.
Q. From Bill McBee?
A. Yeah.
(Trial Tr., Vol. VIII, at 97–98.)

not mention breed-to-breed legislation[3] nor did he tape record what occurred during the transaction. As McBee would later testify, however, Blandford had accepted money from him on at least one prior occasion (in 1990) knowing that the money was intended to influence his position with respect to pending horse racing legislation.

The FBI arranged for McBee to make a second payment to Blandford soon after Spurrier, McBee, and Blandford returned from the Florida junket. This time the transfer was to take place during a dinner party to be held at Spurrier's hotel suite in Frankfort. In preparation for the dinner and with court authorization, the FBI set up video and audio surveillance equipment in different parts of Spurrier's suite. The dinner went forward as planned on February 20, 1992. Blandford was not the only general assembly member or guest to attend. Representative Jerry Bronger, among others, also was present. During the course of the dinner, Blandford accepted $500 from McBee in one of the suite's two bedrooms.[4] Once again, however, McBee did not mention breed-to-breed legislation in handing over the cash. He simply stated: "Here's a little something from MR. SPURRIER and me and the harness horse people and ... so forth." Blandford replied: "All right. Well that's wonderful!"[5]

A second dinner in Spurrier's hotel suite would provide McBee with yet another opportunity to give FBI money to Blandford. Although, at the time, there was no breed-to-breed restriction on simulcasting and intertrack wagering in Kentucky's 1992 horse racing legislation ("horse bill"), the possibility that such a restriction would be added to the horse bill still remained. As industry participants and the FBI were well aware, the horse bill, which was drafted by the governor and submitted to the relevant house committee on March 2, 1992, could be amended to include a breed-to-breed restriction as late as March 23, 1992.

Again, the FBI obtained court approval to place surveillance equipment in selected spots in Spurrier's suite. On this occasion, the bedroom in which the February 20 dinner payments had occurred was outfitted with both audio and video surveillance devices. Prior to this dinner, which took place on March 11, 1992, Spurrier provided McBee with another $500 to give to Blandford. Spurrier specifically instructed McBee to inform Blandford that the payment was conditioned upon Blandford's opposition to breed-to-breed legislation. Notwithstanding Spurrier's instructions, McBee was only marginally less cryptic than before when it came to informing Blandford about the reason behind the payment. During McBee's and Blandford's conversation, which took place in the bugged bedroom, the following exchange took place:

BLANDFORD: Whatta ya got there? (CHUCKLES)

MC BEE: Another five.

BLANDFORD: Well what is that?

MC BEE: Harness people.

BLANDFORD: Huh?

MC BEE: Your governor's taking care ... your governor's taking care of the bill.

BLANDFORD: Well, what ... what ...

MC BEE: When I get it, I share! (LAUGHS)

BLANDFORD: Hey, bless your heart.

MC BEE: Huh?

BLANDFORD: Bless your heart.

MC BEE: I share with my buddies!

BLANDFORD: Are we all right?

MC BEE: No breed to breed. Ain't in there.

---

3. McBee offered the following explanation for his decision not to broach the subject of breed-to-breed legislation: "I wasn't going to say anything to the Speaker about Riverside Downs until I thought the time was right."

4. In this particular bedroom, the FBI had set up only audio interception devices.

5. Later that evening, Bronger accepted his payment, also for $500, in the same bedroom. As he handed over the cash, McBee cautioned Bronger not to say anything to Kenneth Rapier, another state representative attending the dinner, "cause this here is between Donnie [Blandford], you, and me[.]"

BLANDFORD: (UNINTELLIGIBLE—UI)

MC BEE: Everything's doin' fine. And they're ... they're not pushing us. I know you hate Riverside but you can't legislate 'em out of business. Let 'em go out of business on their own.

BLANDFORD: Yeah, but we're ... I mean, we're not ... we don't have a con.... we don't have ah ...

MC BEE: (UI)

BLANDFORD: Okay ...

MC BEE: No ... (UI)

BLANDFORD: MR. BRERETON called me today (UI) ... that's a helluva horse bill (UI). You fin ... you finally did right. (UI) I said you don't just throw something out there and say, hey, (UI). I know that now.

MC BEE: And ah no breed to breed, RED MILE stay alive, and then that bunch down there stays alive for a little while but it'll be gone.

BLANDFORD: Yeah. Okay. All right. Thanks.

MC BEE: (UI) my bills. I'll take care of my buddies! (LAUGHS)

Later that evening, Spurrier expressed his gratitude to Blandford:

SPURRIER: Before you get to leavin', I just want to thank you (door closing), for what you've all done really for the harness people I'm dead serious, they've been fair to'em, they've been fair to especially you know my breed to breed problem.

BLANDFORD: Yeah.

SPURRIER: And I really appreciate it DONNIE and I just.

BLANDFORD: Okay.

SPURRIER: I just wanna say thank you.

BLANDFORD: Okay, hey.

SPURRIER: I'm serious.

BLANDFORD: I know, I, I understand and I know.

SPURRIER: And these people have been good and I've embarrassed them, this ITW's about broke'em.

BLANDFORD: Yeah.

SPURRIER: And, and this has kinda got me off the hook.

BLANDFORD: Okay.

SPURRIER: Thank you.

BLANDFORD: Wonderful.

SPURRIER: (UI) I mean you really just been super.

BLANDFORD: Well, just let, let me know.

SPURRIER: I know.

BLANDFORD: That's all you got to do sometime I, sometime I, sometime I may not be quick enough (door closing) to (UI), but ...

. . . .

SPURRIER: This breed-to-breed thing was just gonna kill us.

BLANDFORD: I know, well ...

SPURRIER: No I mean just ...

BLANDFORD: (UI)

SPURRIER: ... it was [a] personal thing.

BLANDFORD: ... I know.

SPURRIER: And once we killed that we done good.

BLANDFORD: That's right. It wasn't gonna go, you gotta (UI)

SPURRIER: I know.

BLANDFORD: ... you know you gotta ...

SPURRIER: It's fair ...

BLANDFORD: Okay.

SPURRIER: It turned out.

BLANDFORD: Okay.

SPURRIER: But that don't happen often.

BLANDFORD: Sometimes you know, you, you, you ... wonder how you're ever gonna get here, through the process but you ... (UI) bother me until get where you're (UI)

SPURRIER: I just wanna say (UI)

(Government's Trial Ex. # 28.)

## B. False Statements to the FBI

Plans to stage a third dinner were held in abeyance when the FBI instead decided to reveal the operation to McBee in hopes that it could then enlist his informed cooperation. When confronted by the FBI on March 30, 1992, McBee, though initially receptive to the

agency's overture, refused to assist the investigation. The following day the FBI approached Blandford, himself. Two FBI agents showed up at Blandford's office with a tape recorder and copies of the video and audio tapes of the February 20 and March 11 dinners.[6]

After Blandford consented to the recording of the interview, the agents asked him several times whether he recently had been offered payments in exchange for his position on a piece of legislation. Blandford repeatedly denied that he had received such offers from anyone, including McBee. In fact, he continued his denials even after the agents played the video and audio tapes for him.

## C. RICO Violations

The FBI's inquiry into Blandford's affairs was not limited to his conduct with respect to the state's horse racing industry. Indeed, after it had interviewed Blandford, the FBI obtained information regarding Blandford's alleged misuse of campaign funds from Buel Guy, Blandford's chief administrative assistant from 1984 to September 1992. According to Guy, in 1986 Blandford loaned money taken from his campaign account ($3,500) to Patricia Foley, who was at that time Blandford's secretary and girlfriend. Foley used the money for a down payment on a car.

Guy described the way in which Blandford set up the loan. First, Blandford wrote a check drawn on his campaign account to Guy. He then instructed Guy to cash the check and return the money to him. Guy complied, and Blandford turned the money over to Foley. Blandford later explained that since Foley had worked for his campaign during her spare time, "he felt that campaign funds could be used to compensate her for that work." (Appellant's Brief at 10.) Eventually, Guy, on behalf of Blandford, reported the $3,500 check to the Kentucky Registry of Election Finance ("KREF") and the Davies County Clerk, claiming that it represented a reimbursement for campaign-related work.[7] To allay Guy's concern that he would have to pay income taxes on the $3,500, Blandford wrote another check to Guy for $1,018.50. Blandford eventually would offer the same justification for this second check; namely, that Guy, like Foley, had been undercompensated for work on previous campaigns. On January 4, 1988, a report was filed—apparently through the United States mail[8]—with the KREF for this check as well. Although Guy filled out and signed the report, it was Blandford who gave him the permission and authority to do so. Moreover, Blandford provided Guy with the information to include in the report. Again, the check was designated as reimbursement for a campaign expense.

Based on these facts, a federal grand jury returned an indictment charging Blandford with conspiracy and attempt to commit extortion, in violation of 18 U.S.C. § 1951 (Counts 1 and 2, respectively). The indictment further charged Blandford with a RICO violation. 18 U.S.C. § 1962(c). In this regard, the indictment listed four racketeering acts. While either of the offenses detailed in Counts 1 and 2 accounted for the first such act, acts two through four consisted of three separate instances of alleged mail fraud, each pertaining to Blandford's misuse of campaign funds. Finally, Count 4 charged Blandford with making false statements to FBI agents during his March 31, 1992, interview, in violation of 18 U.S.C. § 1001.

Following a two-week trial, a jury acquitted Blandford of Count 1 and convicted him of Counts 2, 3, and 4. After unsuccessfully

---

6. Blandford contends that the agents disguised their true motive behind questioning him by announcing only that they had "received some allegations concerning public corruption in the State of Kentucky." Blandford adds that the agents waited until mid-way through the interview to "spr[i]ng" the tapes of the previous dinners on him.

7. Under Kentucky law, campaign finance reports are to be filed with both the KREF and the county clerk in the candidate's county of residence. Guy testified that ordinarily this was done by sending the reports to the required destinations via the United States mail.

8. There is some dispute as to whether this report was, in fact, sent through the United States mail. Blandford contests Guy's assertion that the United States mail was the customary means of sending campaign expense reports.

moving for a new trial and for a judgment of acquittal, Blandford was sentenced to concurrent terms of imprisonment of 64 months (Counts 2 and 3) and 60 months (Count 4). In addition, Blandford was assessed a $10,000 fine and an additional $108,356 for the cost of his incarceration.

Blandford then filed a motion with the district court requesting a stay of the fine and a release on bail pending his appeal. When the district court denied his motion, Blandford requested the same relief from this court in the form of an emergency motion. Initially, this court stayed the fine for the cost of incarceration upon an appropriate bond and conditions to be determined by the district court. We also temporarily stayed the commencement of Blandford's sentence until September 27, 1993, to allow a full panel of the court to consider the matter. After the district court directed the filing of a bond as to the fine, a three-member panel of this court declined to grant Blandford release pending this appeal.

## II.

### A.

On appeal, Blandford mounts several challenges to his Hobbs Act conviction. Title 18 U.S.C. § 1951, which sets forth the definition of "extortion," provides in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

. . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or *under color of official right.*

(Emphasis added).

First, Blandford takes issue with the district court's jury instructions pertaining to Counts 1 and 2 of his indictment. The instructions were in error, he complains, because they did not require the jury to find that he had entered into an explicit agreement (or *quid pro quo*) with Riverside Downs to oppose breed-to-breed legislation. Blandford also argues for the reversal of his extortion conviction on the ground that the evidence against him was insufficient to support the jury's verdict.

Two decisions of the Supreme Court inform our analysis of these claims. *See Evans v. United States,* —— U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992); *McCormick v. United States,* 500 U.S. 257, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991). In *McCormick,* a West Virginia legislator was convicted of extortion and income tax evasion for accepting cash payments in exchange for his agreement to support legislation furthering the efforts of graduates of foreign medical schools to practice medicine within the state while they attempted to pass the state's licensing exam. The payments, which were deemed campaign contributions, were made by lobbyists who had been retained by the foreign doctors. After receiving several "contributions," the legislator in question made good on his promise by sponsoring legislation that allowed foreign doctors to be permanently licensed—notwithstanding their failure to pass the state's exam—by virtue of their years of experience.[9]

The legislator challenged his conviction, arguing that the trial court's jury instructions were flawed because they did not contain a *quid pro quo* requirement.[10] The

---

**9.** Earlier, the legislator had sponsored a bill that extended a program permitting foreign doctors to practice while they were attempting to pass the licensing exam.

**10.** With regard to the offense of extortion under color of official right, the district court instructed the jury in pertinent part that

it is not necessary that the government prove that the defendant committed or promised to commit a quid pro quo, that is, consideration in the nature of official action in return for the payment of the money not lawfully owed. Such a quid pro quo may, of course, be forthcoming in an extortion case or it may not. In

Court agreed and reversed the conviction, stating:

> The receipt of [campaign] contributions is . . . vulnerable under the Act as having been taken under color of official right, *but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act.* In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

*Id.* at 273, 111 S.Ct. at 1816–17 (emphasis added); *see also United States v. Bibby,* 752 F.2d 1116, 1127 n. 1 (6th Cir.1985) ("What the Hobbs Act proscribes is the taking of money by a public official in exchange for *specific* promises to do or refrain from doing *specific* things. In other words, there must be a *quid pro quo.*") (citation omitted), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986). The Court grounded its decision in a realistic view of the campaign contribution system that we, as a nation, have (for better or worse) adopted. In this regard, the *McCormick* Court observed:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend

to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would require statutory language more explicit than the Hobbs Act contains to justify a contrary conclusion.

500 U.S. at 272–73, 111 S.Ct. at 1816–17.[11]

In *Evans,* the Court granted certiorari to resolve a split in the circuits with respect to one of the questions it expressly declined to address in *McCormick;* namely, whether an affirmative act of inducement on the part of a public official is an element of extortion under color of official right. The defendant in *Evans,* a commissioner of a county in Georgia, accepted campaign contributions totalling $8,000 from an FBI agent posing as a real estate developer. In exchange for the

---

either event it is not an essential element of the crime. *McCormick,* 500 U.S. at 264 n. 4, 111 S.Ct. at 1812 n. 4.

The day after this instruction was issued, the jury asked the court for further clarification. The court, in substance, repeated the same instruction, but added that "extortion does not occur where one who is a public official receives a legitimate gift or a voluntary political contribution even though the political contribution may have been made in cash in violation of local law. Voluntary is that which is freely given without expectation of benefit." *Id.* at 265, 111 S.Ct. at 1812.

**11.** As the Seventh Circuit recently put it:

*McCormick* recognized several realities of the American political system. Money fuels the American political machine. Campaigns are

expensive, and candidates must constantly solicit funds. People vote for candidates and contribute to candidates' campaigns because of those candidates' views, performance, and promises. It would be naive to suppose that contributors do not expect some benefit—support for favorable legislation, for example—for their contributions.

. . . Because of the realities of the American political system, and the fact that the Hobbs Act's language did not justify making commonly accepted political behavior criminal, the Supreme Court in *McCormick* added to this definition of extortion the requirement that the connection between the payment and the exercise of office—the quid pro quo—be explicit. *United States v. Allen,* 10 F.3d 405, 410–11 (7th Cir.1993).

money, the defendant assured the agent-developer that he would do what he could to assist the agent-developer in obtaining rezoning approval for a tract of land. The defendant was not able to perform his end of the bargain, however, because he was arrested before he had an opportunity to do so. In challenging his extortion conviction, the defendant took issue with the jury instructions, which he claimed "did not require the jury to find 'an element of duress such as a demand'"; permitted the jury "to convict him on the basis of the 'passive acceptance of a contribution'"; and "did not properly describe the *quid pro quo* requirement for conviction if the jury found that the payment was a campaign contribution."[12] —— U.S. at ——–——, 112 S.Ct. at 1888–89.

The Court, however, rejected the defendant's attack on the jury instructions and affirmed his conviction. The Court ruled:

> We reject petitioner's criticism of the instruction, and conclude that it satisfies the *quid pro quo* requirement of *McCormick* ... because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense. We also reject petitioner's contention that an affirmative step is an ele-

ment of the offense of extortion "under color of official right" and need be included in the instruction.... *We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.*

—— U.S. at ——, 112 S.Ct. at 1889 (footnotes omitted) (emphasis added).

Exactly what effect *Evans* had on *McCormick* is not altogether clear. The federal circuit courts that have considered the matter assume that the former establishes a modified or relaxed *quid pro quo* standard to be applied in non-campaign contribution cases. Under this view, the comparatively strict standard of *McCormick* still would govern when the alleged Hobbs Act violation arises out of the receipt of campaign contributions by a public official. *See United States v. Martinez,* 14 F.3d 543, 553 (11th Cir.1994); *United States v. Taylor,* 993 F.2d 382, 385 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 249, 126 L.Ed.2d 202 (1993); *United States v. Garcia,* 992 F.2d 409, 414 (2d Cir.1993). These courts evidently assume, without engaging in any rigorous analysis, the validity of their position. The following passage taken from the Fourth Circuit's decision in *Taylor* is illustrative:

12. The district court had instructed the jury as follows:

> The defendant can be found guilty of [18 U.S.C. § 1951] only if all of the following elements are proved beyond a reasonable doubt: First, that the defendant induced the person described in the indictment to part with property or money; second, that the defendant did so knowingly and willfully by means of extortion as hereinafter defined; third, that the extortionate transaction delayed, interrupted or adversely affected interstate commerce.
>
> Now, extortion in a case involving a public official means the wrongful acquisition of property from someone else under color of official right.
>
> Extortion under color of official right is the wrongful taking by a public official of money or property not due him or his office whether or not the taking was accompanied by force, threat or the use of fear. In other words, the wrongful use of otherwise valid official power may convert dutiful actions into extortion.
>
> So, if a public official *agrees* to take or withhold official action or [sic] the wrongful purpose of inducing a victim to part with proper-

ty, such action would constitute extortion even though the official was already duty-bound to take or withhold the action in question.

. . . .

> The defendant contends that the $8,000 he received from Agent Cormany was a campaign contribution. The solicitation of campaign contributions from any person is a necessary and permissible form of political activity on the part of persons who seek political office and persons who have been elected to political office. Thus, the acceptance by an elected official of a campaign contribution does not, in itself, constitute a violation of the Hobbs Act even though the donor has business pending before the official.
>
> However, if a public official demands or *accepts* money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution.

*United States v. Evans,* 910 F.2d 790, 795–96 (11th Cir.1990), *aff'd,* —— U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992).

It is necessary for the prosecution to prove under the *Evans* standard "that a public official has obtained a payment to which he is not entitled, knowing that the payment was made in return for official acts." Or, if the jury finds the payment to be a campaign contribution, then, under *McCormick*, it must find that "the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."

993 F.2d at 385 (citation omitted). In short, these circuits have concluded that *Evans*, aside from addressing the question of inducement, also resolved an additional question expressly left unanswered by the *McCormick* Court—"whether a *quid pro quo* requirement exists in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value." 500 U.S. at 274 n. 10, 111 S.Ct. at 1817 n. 10.

We read *Evans* somewhat differently. *Evans*, we believe, merely clarified (1) that no affirmative step towards the performance of the public official's promise need be taken (*i.e.*, fulfillment of the *quid pro quo* is not an element of the offense) and (2) that the *quid pro quo* of *McCormick* is satisfied by something short of a formalized and thoroughly articulated contractual arrangement (*i.e.*, merely knowing the payment was made in return for official acts is enough). It was important for the Court to provide the former clarification because of a factual discrepancy between the two cases; in *McCormick*, unlike *Evans*, the defendant actually had performed his promise before his arrest. And in the case of the latter clarification, the Court gave content to what the *McCormick* quid pro quo* entails. As Justice Kennedy explained in his concurrence:

The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frus-

trated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it.

The criminal law in the usual course concerns itself with motives and consequences, not formalities. And the trier of fact is quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor.

—— U.S. at ——, 112 S.Ct. at 1892 (Kennedy, J., concurring). In this sense, then, *Evans* provided a gloss on the *McCormick* Court's use of the word "explicit" to qualify its *quid pro quo* requirement. Explicit, as explained in *Evans*, speaks not to the form of the agreement between the payor and payee, but to the degree to which the payor and payee were aware of its terms, regardless of whether those terms were articulated. Put simply, *Evans* instructed that by "explicit" *McCormick* did not mean "express."[13]

To the extent *Evans* charted entirely new waters, it did so not to differentiate campaign contribution cases from non-campaign contribution cases, but only to consider the issue on which certiorari was granted, the issue of inducement. Our reading of *Evans*—as limited to the campaign contribution context—is bolstered by the fact that the case, after all, involved campaign contributions. Moreover, the majority did not purport to extend its holding beyond the immediate context, nor did the issues before the Court require it to do so. *See United States v. McDade*, 827 F.Supp. 1153, 1171 n. 8 (E.D.Pa.1993) (refusing to apply *McCormick*'s *quid pro quo* requirement in non-campaign contribution case); *but see Evans*, —— U.S. at ——, 112 S.Ct. at 1894 ("Readers of today's opinion

---

**13.** That the terms may be distinguished in this manner is borne out by their respective definitions. Black's Law Dictionary defines "explicit" as "[n]ot obscure or ambiguous, having no disguised meaning or reservation. *Clear in understanding.*" Black's Law Dictionary 579 (6th ed. 1990) (emphasis added). "Express," on the other hand, is defined as:

Clear; definite; explicit; plain; direct; unmistakable; not dubious or ambiguous. *Declared*

in terms; set forth in words. Directly and distinctly stated. Made known distinctly and explicitly, and not left to inference. Manifested by direct and appropriate language, as distinguished from that which is inferred from conduct.* The word is usually contrasted with "implied."

*Id.* at 580 (emphasis added).

should have little difficulty in understanding that the rationale underlying the Court's holding applies not only in campaign contribution cases, but all § 1951 prosecutions.") (Kennedy, J., concurring); *id.* —— U.S. at ——, 112 S.Ct. at 1899 (suggesting that the Court extended *McCormick*'s *quid pro quo* requirement to all cases of official extortion) (Thomas, J., dissenting).

Pursuant to our interpretation of *Evans*, we cannot be certain whether the Supreme Court would have courts apply a different standard when a public official's acceptance of payments that are concededly not campaign contributions forms the basis for that official's extortion charge. Indeed, a strong argument could be advanced for treating campaign contribution cases and non-campaign contribution cases disparately. Campaign contributions, as the *McCormick* Court noted, enjoy what might be labeled a presumption of legitimacy. Although legitimate campaign contributions, not unlike Hobbs Act extortion payments, are given with the hope, and perhaps expectation, that the payment will make the official more likely to support the payor's interests, we punish neither the giving nor the taking presumably because we have decided that the alternative of financing campaigns with public funds is even less attractive than the current arrangement. Conversely, if any presumption is to be accorded to payments that occur outside of the campaign contribution context, the presumption would be the antithesis of the one described above. Stated another way, where, as in this case, a public official's primary justification for receiving, with relative impunity, cash payments from private sources, *i.e.*, our present campaign financing system, is not available, that public official is left with few other means of rationalizing his actions.[14]

■ That *Evans* and *McCormick* involved a public official's receipt of campaign contributions does not mean that they are inappo-site for our present purposes. For instance, one thing that we do know from *Evans* is that a Hobbs Act conviction for extortion under color of official right will be sustained in campaign contribution cases when the government establishes the existence of a *quid pro quo*, as set forth in *McCormick* and informed by *Evans*. From this proposition, it follows *a fortiori* that in non-campaign contribution cases, which are perhaps less, but clearly not more, difficult to prove from the government's standpoint, the same showing of a *quid pro quo* also would suffice. Additionally, *Evans* approved of this court's decision in *United States v. Butler*, 618 F.2d 411 (6th Cir.), *cert. denied*, 447 U.S. 927, 100 S.Ct. 3024, 65 L.Ed.2d 1121 (1980). In *Butler*, a non-campaign contribution public extortion case, we noted the congruence of the crimes of public extortion and bribery. We elaborated:

> Assuming *arguendo*, that Butler's conduct consisted of the mere passive acceptance of a bribe, it is the position of the United States that such conduct, whether the solicitation of, or the mere acceptance of, illicit payments for the desired "official action", was a clear abuse of Butler's office, falling within the proscriptions of the [Hobbs] Act. We agree. Butler's contention that a distinction under the Act is drawn between the voluntary payment of a bribe, and extortion, by way of the inducement or initiation of such payment, is a technical overdrawn distinction which is in keeping with neither the legislative intent of the statute, nor recent case law holding that in cases of misuse of official power, bribery and extortion are not mutually exclusive.

*Id.* at 417 (citing, *inter alia*, *United States v. Harding*, 563 F.2d 299 (6th Cir.1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978)); *see also Evans*, —— U.S. at ——, 112 S.Ct. at 1885 (noting equivalence of both crimes at common law).[15]

---

14. We do not intend to imply that the receipt of a non-campaign contribution payment is *ipso facto* a Hobbs Act violation. The receipt of such a payment, for instance, would not be actionable where *de minimis* amounts were at stake or where the funds were earmarked for the recipient official's legal defense fund.

15. The *Butler* court went on to state
 that the crux of the statutory requirement of "under color of official right" is the wrongful use of one's office to obtain payments. The [Seventh Circuit has] held that "[i]t matters not whether the public official induces payments to perform his duties or not to perform

It is against this backdrop that we evaluate Blandford's challenges to the jury instructions and the sufficiency of the evidence relative to his extortion conviction. The former is easily dismissed. Apparently operating under the mistaken assumption that *Evans* controlled the case at bar, the district court issued an instruction that tracked the relevant portion of the holding in *Evans,* quoting directly therefrom. *See United States v. Coyne,* 4 F.3d 100, 114 (2d Cir.1993) (rejecting challenge to jury instruction on the basis that "it set out the *quid pro quo* requirement and tracked the Supreme Court's statement in *Evans* "), *cert. denied,* —— U.S. ——, 114 S.Ct. 929, 127 L.Ed.2d 221 (1994). The court charged:

> [E]xtortion means the obtaining of property, to which one is not entitled, from another with that person's consent, under color of official right. *A public official commits extortion when he obtains a payment to which he was not entitled, knowing that the payment was made in return for his official acts.*
>
> . . . .
>
> *[To find the defendant guilty, the government must prove] that the defendant intended to obtain property or a payment to which he was not entitled with the knowledge that the property or payment was being given in return for an official act or an exercise of his official authority in regard to legislation* potentially including Breed to Breed provisions. As with Count One, the term "property" as used in Count Two means money or other tangible and intangible things of value.

(Emphasis added). Our discussion above should make clear that this instruction, far from prejudicing Blandford, actually inured to his benefit. In effect, the instruction made the government prove a campaign contribution case even though no campaign con-

his duties, or even, as here, to perform or not to perform acts unrelated to his duties which can only be undertaken because of his official position. So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951. That such conduct may also constitute "classic bribery" is not a relevant consideration."

tributions had in fact been made. *See Garcia,* 992 F.2d at 414 (noting that instruction, which required government to prove inducement, was not objectionable because it imposed an additional burden of proof on the government).

Turning to Blandford's sufficiency of the evidence argument, the issue, as we have framed it, is as follows: Was there sufficient evidence from which a reasonable juror could conclude that Blandford accepted a bribe? Blandford contends that the cash payments he received from McBee during the course of Operation BOPTROT were not in exchange for his official acts. Rather, he claims the payments were given merely as "a gratuity . . . because of [his] status as Speaker." (Reply Brief at 6.) In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

▮ Judged against the evidence presented, Blandford's position is untenable. It is incontrovertible that Blandford accepted three $500 payments from McBee within a span of three months and that Blandford cannot make any legitimate claim of entitlement to these payments. In our estimation, the evidence (in particular, the transcripts of the taped discussions) further established that Blandford accepted the payments knowing (1) that McBee was a harness race track lobbyist; (2) that the source of the money was "the harness horse people"; and (3) that the Kentucky horse bill, which contained or potentially contained issues of vital importance to the harness racing industry (including breed-to-breed legislation) was pending.[16]

618 F.2d at 420 (quoting *United States v. Braasch,* 505 F.2d 139, 151 (7th Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975)).

**16.** Although the transcripts are admittedly not models of clarity, we again note that, consistent with our reading of *Evans,* an express agreement is not required for a public extortion violation to arise even in a campaign contribution case.

From this, a rational juror could have concluded not only that the motivation underlying the payments (*i.e.*, the desire to buy or influence Blandford's vote) was corrupt, but also that Blandford understood he was being paid for his ability to act on this motivation. In other words, a rational juror could have surmised that Blandford accepted the payments despite being aware that his acceptance would engender certain expectations on the part of the payor. *See Coyne*, 4 F.3d at 114 ("[I]t is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arise.").

In sum, the evidence was sufficient to demonstrate that the "motivation for the payment[s] focuse[d] on the recipient's office." *Butler*, 618 F.2d at 418. Blandford is certainly correct in observing that he was given the money because he was the Speaker of the House; but for the fact that he had the power to influence horse racing legislation, he would not have been offered the payments in the first place. Blandford, however, draws the wrong conclusion from this observation. Rather than insulating him from prosecution, Blandford's acceptance of cash from McBee, under the circumstances, plainly constitutes acceptance of a bribe. The use of public office to benefit one's personal financial status in this fashion is precisely the evil that "under color of official right" extortion was designed to prevent. *Id.* at 420.

■ Blandford also maintains that Count 2 of his indictment was duplicitous because it contained more than one alleged act of extortion.[17] In this regard, apparently he argues that under Count 2 the jury could have convicted him for extortion without unanimously agreeing that he committed at least one of the listed acts. Blandford's concern, however, was addressed by the district court when it offered the following instruction:

One more point about count 2. As I have just told you, the indictment accuses the defendant of attempting to obtain money from William McBee in exchange for his influence with regard to legislation potentially containing breed-to-breed provisions. The first payment allegedly occurred on January 31, 1992. The second payment allegedly occurred on February 20, 1992. The third payment allegedly occurred on March 11, 1992.

The government does not have to prove all of these for you to return a guilty verdict on this charge. Proof beyond a reasonable doubt of one of these three payments is enough. But in order to return a guilty verdict, all twelve of you must agree that the same one has been proved.

In light of this unanimity instruction, we reject Blandford's duplicity argument. *See United States v. Cherif*, 943 F.2d 692, 701 (7th Cir.1991) ("The problem Cherif complains about—the possibility that the jury would convict him even though it did not unanimously agree on what false statement he made—could easily have been cured by an instruction telling the jury that it could convict Cherif on the false statement count only if it unanimously agreed on the false statement he made."), *cert. denied*, ―― U.S. ――, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992).

■ Blandford further maintains that the district court erred by admitting into evidence the tape recorded statements made by his alleged co-conspirator, Jerry Bronger. Blandford claims that the statements which were made during the February 20 and March 11 dinners were highly prejudicial to his defense because they "show an express *quid pro quo* between [McBee's] payment of

Thus, as noted above, in non-campaign contribution cases, the need for a fully articulated *quid pro quo* arguably is diminished to an even greater extent.

**17.** As we explained in *United States v. Duncan*, 850 F.2d 1104, 1108 n. 4 (6th Cir.1988):

A duplicitous indictment is one that charges separate offenses in a single count. The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each of-

fense, making it difficult to determine whether a conviction rests on only one of the offenses or on both. Adverse effects on a defendant may include improper notice of the charges against him, prejudice in the shaping of evidentiary rulings, in sentencing, in limiting review on appeal, in exposure to double jeopardy, and of course the danger that a conviction will result from a less than unanimous verdict as to each separate offense.

the money and Bronger's help in killing breed-to-breed." (Appellant's Brief at 20.)

"In order to admit the statement of a co-conspirator under Fed.R.Evid. 801(d)(2)(E), it must first be determined that the conspiracy existed, that the defendant was a member of the conspiracy, and that the co-conspirator's statements were made 'in furtherance of the conspiracy.'" *United States v. Gessa,* 971 F.2d 1257, 1261 (6th Cir.1992) (en banc). Each element must be proved by a preponderance of the evidence, and we review the district court's determinations for clear error. *Bourjaily v. United States,* 483 U.S. 171, 176, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987).

Here, Blandford does not deny that, at least as between McBee and Bronger, a conspiracy to extort existed; nor does he deny that Bronger's statements furthered the conspiracy. Instead, he contends that he was not, himself, part of a conspiracy. The district court rejected Blandford's contention, stating:

> I think that there is evidence [of a conspiracy] on the boat trip; I think that [Blandford] took money or knew the trip and the money and everything that was coming from McBee was from the harness people. And there's a bill deal involved with the harness people, and it was in his capacity as a legislator. So he conspired at least with Mr. McBee to do this, to take money.
>
> Now further, on the preceding tape or the tape prior to this, the one that's on the videotape, McBee tells Blandford [at the February 20 dinner], 'I am going to take care of Bronger next. Is that okay with you,' and Don says, 'Fine.'
>
> Now that indicates that there is an understanding amongst McBee and Blandford that Bronger is going to get some money for doing something, too.
>
> Now if this doesn't look like a conspiracy to influence a legislator for some reason

other than in his official business, for his official actions, I don't know if I've ever seen one.

> This statement that they're going to make now is in furtherance of what was previously done, what was told on the boat trip, according to the evidence the United States has offered, that this whole thing is for the harness people, and Riverside Downs is harness people.

In light of this analysis, we are persuaded that the district court did not clearly err by admitting the disputed statements.[18]

■ Blandford also claims the court erred by expanding the scope of the conspiracy as well as its intended victim beyond the particular conspiracy offense detailed in his indictment. Specifically, Blandford asserts that the court transformed the conspiracy from one to prevent breed-to-breed legislation into one aimed at the horse bill in its entirety. Moreover, the court, Blandford argues, determined that the targets of the extortion conspiracy were "harness people," not Riverside Downs as provided for in the indictment. By thus mischaracterizing the nature of the conspiracy, Blandford submits the district court not only "allowed the jury to equate legitimate lobbying on the [horse bill] with corrupt lobbying on 'breed-to-breed'" (appellant's brief at 23), but also enabled the government "to unload on the jury a vast amount of evidence that otherwise should have been inadmissible." (*Id.* at 24.)

"A variance occurs when 'the charging terms [of the indictment]' are unchanged, but the evidence at trial proves facts *materially different* from those alleged in the indictment." *United States v. Hathaway,* 798 F.2d 902, 910 (6th Cir.1986) (emphasis added). A variance cannot, however, serve as the basis for reversal unless the defendant's "substantial rights" have been affected. *Id.* at 911. "Substantial rights, in turn, are af-

---

**18.** Additionally, as the district court pointed out in its order denying Blandford's motions for a new trial and a judgment of acquittal, the admission of Bronger's statements had little bearing on the jury's ultimate decision. The court noted:

> The jury's verdict by itself defeats the basis for [Blandford's] argument. In order to acquit the defendant on the conspiracy charge, the

jury must have given little weight to the co-conspirator statements implicating the defendant in the conspiracy. The court can discern no prejudice to the defendant from permitting these statements to be presented to the jury in the context of the entire body of evidence on all four counts.

(Footnote omitted.)

fected only when a defendant shows 'prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions.'" *Id.* The defendant has the burden of proving the existence of a variance and that such variance is "fatal." *Id.*

Based on our review of the record, we are unpersuaded by Blandford's arguments as to a fatal variance. Indeed, as the government correctly observes, Count 1 of the indictment is not as limited in its allegations as Blandford would have this court believe. For instance, Count 1 alleges that Blandford "conspired to obtain property of another" without specifying that Riverside Downs was the only possible source of such property. Because we conclude that a variance has not occurred in the instant case, we need not consider whether and to what extent Blandford's substantial rights have been impaired.

### B.

Blandford also challenges his RICO conviction. It is a crime under RICO for

> any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). The Supreme Court has set forth the elements that must be alleged in order to state a claim under § 1962(c) as follows: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted); *see also Hofstetter v. Fletcher,* 905 F.2d 897, 901 (6th Cir.1988).

In his first assignment of error relative to his RICO conviction, Blandford argues that his predicate acts of mail fraud [19] were impermissibly based on an "intangible rights"

theory. *See McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In *McNally,* the Court held that the mail fraud statute, 18 U.S.C. § 1341, is "limited in scope to the protection of property rights." 483 U.S. at 360, 107 S.Ct. at 2882; *see also United States v. Kerkman,* 866 F.2d 877, 879 (6th Cir.) ("[*McNally* ] held that [§ 1341] applies only to schemes or artifices which defraud or attempt to defraud someone or something of money or property."), *cert. denied,* 493 U.S. 828, 110 S.Ct. 95, 107 L.Ed.2d 59 (1989). As such, the Court determined that the statute "was inapplicable to schemes designed to defraud 'people or the government of intangible rights, such as the right to have public officials perform their duties honestly.'" *Kerkman,* 866 F.2d at 879. Blandford further contests the government's basis for finding fraud in the instant action—his mishandling of campaign funds. He claims that Kentucky law does not prohibit an elected official from using campaign funds for personal use when that official continues to seek re-election to the same office.

Again, however, Blandford's claims are without merit. As to his assertion that the government relied on an intangible rights theory, we agree with the district court that Blandford "ignores the plain language of the indictment." The court went on to state: "The mail fraud predicates specifically allege that the defendant illegally obtained $6,518.50 from the Campaign Fund and its contributors. This is beyond doubt an allegation that the defendant used the mails to further a scheme to fraudulently obtain money."

■ Similarly, we reject Blandford's contention that his actions were not proscribed under Kentucky law. Section 121.180(10) of the Kentucky Revised Statutes provides in pertinent part:

> Any unexpended balance of funds not otherwise obligated for the payment of expenses incurred to further a political issue or the candidacy of a person shall, at the

---

19. "A conviction for mail fraud requires proof of (1) a scheme to defraud (2) which involves a use of the mails (3) for the purpose of executing the scheme." *United States v. Castile,* 795 F.2d 1273, 1277–78 (6th Cir.1986). Mailings that are

intended to conceal the fraud are considered to be in furtherance of the scheme. *United States v. Lane,* 474 U.S. 438, 451–53, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986).

election of the candidate or committee, escheat to the State Treasury, be returned pro rata to all contributors or, in the case of a partisan candidate, be transferred to the executive committee of the political party of which the candidate is a member except that a candidate, committee, *or an official may retain such funds to further the same political issue or to seek election to the same office.*

(Emphasis added). Stated simply, we find Blandford's interpretation of this provision untenable. While section 121.180(10) may not by its own terms prohibit the use of campaign funds for personal purposes, it clearly does list four different legitimate uses for such funds.

In this sense, the instant case is readily distinguishable from a case upon which Blandford relies, *United States v. Pisani*, 773 F.2d 397 (2d Cir.1985). The defendant in *Pisani* successfully argued for the reversal of his mail fraud conviction on the ground that New York law did not prohibit a candidate from using campaign funds for personal purposes. In fact, as the court observed, there was no state statute that in any way limited or regulated the use of surplus campaign funds.[20] Here, on the other hand, there does exist a state statute that limits the uses to which excess campaign funds can be put: We consider the four enumerated uses set forth in section 121.180(10) to constitute the entire universe of permissible uses. To be sure, consistent with this provision, an elected official can retain unspent campaign funds, but he may do so only if those funds eventually further the official's re-election effort. Blandford did not use the campaign funds at issue here in connection with a re-election effort, and thus he did not act in accordance with Kentucky law.

■ Next, Blandford argues that there was insufficient evidence that he foresaw the use of the mail as part of his fraudulent scheme. Blandford's argument, however, is belied by the record. Indeed, even his chief administrative assistant, Guy, testified that Blandford's office would routinely send campaign finance reports to the appropriate state and county offices through the mail. *See Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954) ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used."). Moreover, Blandford conceded that he could not have hand-delivered the January 4, 1988, report because he was in Frankfurt with the General Assembly at the time. In short, the evidence, albeit circumstantial, was sufficient to support the jury's determination that the reports at issue had been mailed and that the mailings were essential to the successful fulfillment of the fraudulent scheme.

In his final attack on his RICO conviction, Blandford maintains that the government failed to establish the existence of an "enterprise" and that the predicate acts did not establish a "pattern" of racketeering activity. The Supreme Court defined and distinguished these concepts in instructing that

> [i]n order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering com-

---

**20.** The *Pisani* court did acknowledge that subsequent to the defendant's indictment the state legislature had passed a statute to address this area of the law. The statute provided that "[c]ontributions received by a candidate or a political committee may be expended for any lawful purpose. Such funds shall not be convert-ed by any person to personal use which is unrelated to a political campaign or the holding of a public office or party position." 773 F.2d at 410.

The court observed that "[h]ad this new provision been in effect during the period covered by Pisani's indictment, we would not hesitate to affirm his convictions here." *Id.*

mitted by participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

*United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981) (citation and footnote omitted); *see also* 18 U.S.C. § 1961(4) (defining RICO "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

Here, we are satisfied that the government met its burden of proving both a RICO enterprise and a pattern of racketeering activity. As to the existence of an enterprise, Blandford contends that the "Office of the Representative for House District 14 together with the individuals employed therein" is not, in fact, an "enterprise" within the meaning of 18 U.S.C. § 1961(4). He points out that "[t]here was neither a physical entity for the 'Office' for House District 14, nor were there any 'individuals employed therein'." (Appellant's Brief at 31.)

■ Even were we to assume that Blandford was not in charge of a formal and legally cognizable entity, however, this would not be dispositive of the existence of a RICO enterprise. *See Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528–29. Under § 1961(4), "associations in fact" also are deemed enterprises. The operation headed by Blandford in the instant action represents just such an enterprise. *See, e.g., United States v. Qaoud,* 777 F.2d 1105, 1116 (6th Cir.1985) ("A state or local government office or organization may properly be charged as a RICO enterprise."), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 899 (1986); *United States v. Davis,* 707 F.2d 880, 883 (6th Cir.1983) (holding that county sheriff's office constituted a RICO enterprise where defendants had used the office and their positions therein to secure bribes); *United States v. Thompson,* 685 F.2d 993, 998 (6th Cir.) (holding that reference to "The Office of Governor of Tennessee" as enterprise was permissible under RICO), *cert. denied,* 459 U.S. 1072, 103 S.Ct. 494, 74 L.Ed.2d 635 (1982). The district court recognized as much when it ruled that

> [t]he evidence was clear that the defendant had several employees in his office who performed constituent service for both his constituents as Speaker of the House and his constituents as Representative for the Fourteenth District. These employees performed various duties for the office which constituted the enterprise, including some of the racketeering acts. The evidence supported the jury's conclusion that an enterprise existed.

A "pattern of racketeering activity" is comprised of "at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity[.]" 18 U.S.C. § 1961(5); *see also Vild v. Visconsi,* 956 F.2d 560, 565 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 99, 121 L.Ed.2d 59 (1992). To establish such a pattern, the government must establish not only that at least two predicate acts occurred, but also a "relationship between the predicates" and the "threat of continuing activity[.]" *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). " 'It is this factor of *continuity plus relationship* which combines to produce a pattern.' " *Id.* "Continuity and relationship constitute two analytically distinct prongs of the pattern requirement." *Vild,* 956 F.2d at 566.

■ The relationship requirement is satisfied if the predicate acts " 'have the same or similar purposes, results, participants, victims, *or* methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *H.J., Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901 (emphasis added). The Supreme Court's use of the disjunctive suggests that the Court meant to craft a broad test of relatedness. *See Vild,* 956 F.2d at 571 (Guy, J., dissenting) (noting that "the disjunctive indicates that

the relatedness requirement is met if the predicate acts are the same or similar in any of the enumerated ways[ ]"). In light of this test, we conclude that the predicate acts in dispute here were sufficiently related. They had as their purpose the use of public office for personal benefit, and they, in fact, resulted in such benefit. In this sense, the acts could be viewed as either sharing similar purposes or results or being "otherwise ... interrelated by distinguishing characteristics." Again, either characterization would satisfy the broad *H.J., Inc.* test.

▪ In *Vild*, we discussed at length the continuity requirement. Continuity, we remarked,

"is both a closed- and open-ended concept referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." The plaintiff may prove continuity by showing a series of past related predicates occurring over an extended period of time. A few months period usually is not sufficient. A second means of establishing continuity is to show that the predicates, by their nature, "involve a distinct threat of long-term racketeering activity." ... A third way to prove continuity in this case is to allege "predicates [that] are a regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate 'RICO enterprise.'"

956 F.2d at 569 (citations omitted) (quoting *H.J., Inc.*). Here, the predicates took place over a period of approximately six years. Moreover, Blandford testified that he saw nothing wrong with putting campaign funds to personal use or with accepting even large amounts of money from lobbyists. Under these circumstances, it is beyond peradventure that Blandford's conduct "project[ed] into the future with a threat of repetition."

## C.

▪ Turning to the assignments of error Blandford directs at his conviction under 18 U.S.C. § 1001,[21] we consider first his argument that Count 4 should have been dismissed for its failure to specify the statements supporting the charge. Count 4 stated:

On or about March 31, 1992, in the Eastern District of Kentucky, Franklin County, Kentucky, in a matter within the jurisdiction of the United States Department of Justice and the [FBI] ... the defendant, **DONALD J. BLANDFORD**, did knowingly and willfully make false, fraudulent, and fictitious material statements and representations to [FBI agents], that is, on or about the above date **DONALD J. BLANDFORD** gave a false explanation for monies he had received ·from William McBee on February 20, 1992 and March 11, 1992, at the Capital Plaza Hotel in Frankfort, Kentucky.

Without citing any authority, Blandford urges this court to extend our ruling in a § 1863 perjury case, *United States v. Eddy*, 737 F.2d 564 (6th Cir.1984), to this § 1001 dispute. In *Eddy*, we stated that "in perjury cases, '[n]o guessing is tolerated [in the drafting of a perjury indictment] and the indictment must set out the allegedly perjurious statements and the objective truth in stark contrast so that the claim of falsity is clear to all who read the charge.'" *Id.* at 567.

"The basic Constitutional standard by which to judge the sufficiency of an indictment is mandated by the Sixth Amendment which requires that the indictment inform the defendant of 'the nature and cause of the accusation.'" *United States v. Piccolo*, 723 F.2d 1234, 1238 (6th Cir.1983) (en banc), *cert. denied*, 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 817 (1984). As we stated in *United States v. Gray*, 790 F.2d 1290 (6th Cir.1986),

21. Title 18 U.S.C. §·1001 states:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

*rev'd on other grounds,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987):

An indictment provides adequate notice to a defendant "when it permits the defendant to obtain 'significant protections which the guarantee of a grand jury indictment was intended to confer.'" The sufficiency of an indictment is governed by two "preliminary criteria":

[F]irst, whether the indictment "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet,'" and, secondly, "'in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.'"

*Id.* at 1296–97 (citing, *inter alia, Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)).

Notwithstanding the fact that the indictment did not set forth the precise statements made by Blandford, we find the indictment satisfied the principles enunciated in *Gray.* The indictment alleged that Blandford had made material statements that were false or fraudulent and that he had done so knowingly and willfully. It set forth the nature of the statements as well as when and to whom they were made. It also specified that the statements pertained to an activity within the jurisdiction of a federal agency. *See United States v. Steele,* 933 F.2d 1313, 1318–19 (6th Cir.) (en banc) (discussing elements of § 1001 offense), *cert. denied,* ── U.S. ──, 112 S.Ct. 303, 116 L.Ed.2d 246 (1991). Moreover, a bill of particulars and a revised bill provided Blandford with a more detailed account of the precise statements that supported his § 1001 prosecution. Count 4 of the indictment therefore presented Blandford with adequate notice of the offense for which he was charged.

▆▆ Blandford further maintains that the evidence against him was insufficient to support the jury's verdict. In reaching its verdict, the jury identified three specific question and answer sequences during which Blandford gave false explanations for his receipt of money from McBee at the February 20 and March 11 dinners. Blandford con-

tests each of the sequences, arguing that his responses were "limited to cash campaign contributions" or merely "flat denials" as opposed to "false explanations." An analysis of Blandford's statements in their greater context, however, undermines both assertions. In other words, not only do the statements pertain to more than simply campaign contributions, but they also were offered to explain (falsely) the reason behind Blandford's acceptance of the funds in question. The jury clearly reached the same determination, one that we see no reason to disturb.

▆▆ In his final challenge to his § 1001 conviction, Blandford asserts that his statements were not "material" within the meaning of the statute. In *Steele,* we noted that:

A statement is material for purposes of section 1001 if it has a "natural tendency to influence, or be capable of affecting or influencing," a function entrusted to a governmental agency. It is not necessary to show that the statement actually influenced an agency, but only that it had the capacity to do so. A materiality determination is subject to *de novo* review on appeal.

*Id.* at 1319 (citations omitted). According to Blandford, "the only claim of 'materiality' the government could muster was [Agent] Whitworth's testimony that he later asked Spurrier whether Spurrier gave $500 to McBee for Blandford." (Appellant's Brief at 34.) Because the government already "had the facts," he adds, the government's investigation was merely inconvenienced, if it was hindered at all.

Again, Blandford's argument is without merit. As the government points out, Blandford prevented the government from inquiring more fully into the question of materiality by objecting during the government's questioning of Agent Whitworth. In fact, defense counsel, after making this objection, told the court: "Your Honor, the question of materiality is yours. There is no reason for the jury to hear that." Subsequently, defense counsel stipulated that Agent Whitworth would have testified that the FBI investigation into Blandford's dealings continued beyond the March 31 interview. Under these

706

circumstances, we find Blandford's contention that his statements were not material, *i.e.,* that they did not have the capacity to influence the investigation, unavailing.

### D.

■■ Blandford next asserts that the district court erred by not suppressing the video and audio tapes of the February 20 and March 11 dinners. In particular, Blandford submits that these tapes should have been sealed immediately after they were made. *See* 18 U.S.C. § 2518(8)(a).

Under Title III of the Omnibus Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, electronic surveillance may only be conducted pursuant to court order and in a manner consistent with the requirements of Title III. When the government conducts electronic surveillance ... [18 U.S.C.] § 2518(8)(a) requires that "the contents of any ... communication intercepted by any means authorized by [Title III] shall, if possible, be recorded on tape or wire or other comparable device." Furthermore, these types of recordings shall be done in such a way as will protect the recording from "doctoring" or alterations. Finally, in order to ensure the integrity of the recording, § 2518(8)(a) also requires that immediately upon the expiration of the period of the order, or extension thereof, such recordings shall be made available to the judge issuing such surveillance order and sealed under his direction. Failure "immediately" to seal a recording pursuant to § 2518(8)(a) can result in the exclusion of the evidence.

*United States v. Wilkinson,* 26 F.3d 623, 626 (6th Cir.1994) (citations omitted).

In Blandford's case, Chief Judge William Bertelsman issued orders on February 20, 1992, and March 9, 1992, governing the FBI's surveillance activities for the February 20 and March 11 dinners, respectively. "The February 20, 1992, order provided that interceptions would continue until all communications were intercepted which revealed fully the nature of the criminal activity and its participants, or ten days after the first interception or ten days after the order was entered, whichever was earlier." The March 9,

1992, order, by contrast, "contained the same termination clause, with the provision that the interception would continue for thirty days rather than ten." The tapes of the February 20 dinner were sealed on March 2, and those of the March 11 dinner were sealed on April 7.

Blandford directs our attention to *Wilkinson,* which involved another prosecution that resulted from Operation BOPTROT. In *Wilkinson,* the defendant argued for the suppression of an audiotape that captured a discussion between himself and none other than Jay Spurrier. The government had secured a court order authorizing electronic surveillance on January 7, 1992.

[This order] provided that it would expire on the earliest of three dates: (1) the last date on which the government intercepted conversations with the briefcase recording device; (2) fifteen days measured from the first interception; or (3) twenty-five days measured from entry of the order. The order also stated that interception of oral communications must terminate upon the attainment of the authorized objectives, not to exceed fifteen days measured from the day on which the investigative law enforcement officers first began to conduct an interception of this order, or ten days after the order was entered, whichever was the earlier time.

*Wilkinson,* 26 F.3d at 626–27. Pursuant to this order, the government intercepted the discussion at issue on the day the order was obtained. The government did not attempt to make subsequent interceptions, and the tape was sealed on January 23.

Although the *Wilkinson* court apparently was inclined to accept the defendant's position that the tape should have been sealed consistent with the first option listed in the January 7 order (*i.e.,* "the last day on which the government intercepted conversations"), it remanded the case for further findings. Referencing, among other cases, the Fourth Circuit's decision in *United States v. Suarez,* 906 F.2d 977 (4th Cir.1990), *cert. denied,* 498 U.S. 1070, 111 S.Ct. 790, 112 L.Ed.2d 852 (1991), the court stated:

The case discussed hereinabove points out the importance of particular findings and conclusions regarding the circumstances of, and the reasons given for, delay for any period beyond the immediate requirement of sealing under the Wiretap or Omnibus Crime Control Acts. The district court in this case made no such analysis and did not set out clearly its reasons for finding that the sealing in the instant case was timely or objectively reasonable within the meaning of the law. We are troubled, moreover, by the lack of clarity, the gaps, and problems inherent in the tape itself, as well as the purported transcript thereof. Under all these circumstances, we would find it very helpful for appellate review purposes for the district court to set out specifically the reasons for finding that the sealing was timely and its version of the particular "authentic, accurate, and trustworthy" portions of the tape that deal with the vital meeting between Spurrier and the defendant on January 7, 1992.

*Wilkinson,* 26 F.3d at 628–29.

We do not, however, find *Wilkinson* determinative in this instance. *Wilkinson* differs from the case at bar in at least two significant respects. First, Blandford, unlike his counterpart in *Wilkinson,* does not contend that the tapes, themselves, are of poor quality or lacking in clarity. Second, the district courts in the two cases set forth their reasoning with widely varying degrees of explicitness. For instance, the district court in *Wilkinson* declared simply that "I think that the tapes were properly sealed"; it did not provide "any recitation of authority or further specifications." *Id.* at 627. The court added only that " '[b]oth the admission of tape recordings at trial and a determination of the accuracy of a transcript are within the discretion of this court. *United States v. Robinson,* 707 F.2d 872, 876 (6th Cir.1983).' " *Id.* at 627–28 (footnote omitted). Here, however, the district court was markedly more forthcoming in explaining its decision to reject Blandford's timeliness argument:

The court has reviewed Chief Judge Bertelsman's orders and concludes that the orders extended for the ten day period in the instance of the first order and for a thirty day period in the second instance. During these periods, Chief Judge Bertelsman received interim status reports from Assistant United States Attorney Walbourn and saw no need to terminate the period. Accordingly, the February 20, 1992 tape was required to be sealed immediately following the expiration of the ten day period. The March 11, 1992 tape was required to be sealed immediately following the expiration of the thirty day period.

The February 20, 1992 tape was sealed on March 2, 1992. This was not immediately following the period set forth in the order. However, the United States has provided a satisfactory explanation for the delay, the defendant has not objected to the delay in sealing from February 29, 1992 to March 2, 1992, and the court can discern no prejudice to the defendant. The March 11, 1992 tape was sealed on April 7, 1992, and was within the time period of the order. These tapes were properly and timely sealed and the motion to suppress will be denied.

Thus, we are not confronted with the same problems that led the *Wilkinson* court to remand. We find the district court's interpretation of Judge Bertelsman's orders to be, if not correct, certainly reasonable, and we see no need to further elaborate on the court's well-reasoned analysis.[22]

### E.

Blandford next takes aim at the government, claiming that the assistant United States attorney who prosecuted his case improperly used evidence of co-conspirator McBee's guilty plea as substantive evidence of his own guilt. *But see United States v. Lochmondy,* 890 F.2d 817, 822 (6th Cir.1989) (permitting use of guilty pleas as evidence of witness's credibility); *United States v. Gambino,* 926 F.2d 1355, 1363 (3d Cir.) (same),

---

**22.** Blandford contests the propriety of the FBI's use of video surveillance. His remark that "audio interceptions, alone, were more than adequate," however, is misguided, for video recording devices were needed in his case to establish that McBee actually had made the disputed payments.

*cert. denied,* —— U.S. ——, 112 S.Ct. 415, 116 L.Ed.2d 436 (1991).

■ In a recently decided case, *United States v. Carroll,* 26 F.3d 1380 (6th Cir.1994), this court made clear that the test to be applied in reviewing claims of prosecutorial misconduct is that set forth in *United States v. Bess,* 593 F.2d 749 (6th Cir.1979).[23] Pursuant to the *Bess* test, we ask whether the remarks at issue were improper and if so, whether the impropriety amounts to reversible error. With regard to the second step of its analysis, the *Bess* court elaborated: "More commonly ... the complained-of conduct will not rise to *reversible* error, notably if it is not flagrant, where proof of guilt is over-whelming, where counsel does not object and/or where the trial judge steps in and admonishes the jury." *Id.* at 757. Because we conclude that the remarks Blandford cites were either not improper or, if improper, not grounds for reversal, we reject his argument premised on the alleged misconduct of the prosecution.

■ According to Blandford, the government engaged in misconduct on numerous occasions. The first such occasion occurred during voir dire when the government stated: "You are also going to hear that [McBee has] pled guilty, and he is testifying in this case, and he has a plea agreement...." At this point, defense counsel, arguing that the remark had "tainted the entire pool," moved to quash the entire panel. The government then articulated to the court that its purpose in informing the panel of McBee's plea was "to ask the jury, 'Would you completely ignore anything he had to say simply because of that reason, or would you listen to his testimony.'" Moreover, the government had prefaced its remark by mentioning to the panel that "[McBee's] admission of guilt or his plea of guilty is absolutely not evidence against Speaker Blandford." We are satisfied that, at least as to this incident, the government did not overstep its bounds.[24]

■ Two other occasions Blandford cites as examples of prosecutorial misconduct occurred during the government's opening and closing arguments. In its opening argument, the government commented:

The first factor includes consideration of whether the trial judge gave an appropriate cautionary instruction to the jury. *Leon* does not explain how these factors are to be balanced against one another. The second step of the *Bess* test involves three factors, some of which overlap with the *Leon* factors:

A reviewing court considering improper prosecutorial remarks that are not flagrant is to remand for a new trial if:

(1) proof of defendant's guilt is not over-whelming, *and*

(2) defense counsel objected, *and*

(3) the trial court failed to cure the error with an admonishment to the jury.

*Bess* does not define "flagrant," nor does it instruct what standard one is to apply to flagrantly improper prosecutorial remarks. If we regard the first three *Leon* factors as elucidating the concept of "flagrancy," then the *Bess* test is simply a logical extension of *Leon* that instructs how the four *Leon* factors are to be weighed in situations in which the error is not flagrant.

*Carroll,* 26 F.3d at 1385–86 (citations omitted).

---

**23.** The *Carroll* court explained why this clarification was needed: "Since 1976, the Sixth Circuit has applied at least three different tests for determining whether improper remarks by a prosecutor during closing arguments warrant a new trial. To make matters even more confusing, all three tests have been applied within the past two years." 26 F.3d at 1383 (footnote omitted). The two other tests to which the *Carroll* court referred were established in *United States v. Leon,* 534 F.2d 667 (6th Cir.1976), and *United States v. Thomas,* 728 F.2d 313 (6th Cir.1984), respectively.

Although the court in *Carroll* observed that *Thomas* and *Bess* are clearly at odds with one another, it did manage to reconcile *Leon* and *Bess:*

*Bess* and *Leon* can and should be construed in a way that makes them mutually consistent. Both require a two step approach; first we determine whether a prosecutor's remarks were improper, and then we determine whether the impropriety amounts to reversible error. Regarding the second step, the *Leon* test involves four factors:

(1) whether the remarks tended to mislead the jury or to prejudice the accused;

(2) whether they were isolated or extensive;

(3) whether they were deliberately or accidentally placed before the jury; and

(4) the strength of the evidence against the accused.

**24.** We are further persuaded that the government properly elicited McBee's guilty plea on redirect. In fact, the district court had expressly authorized the government's line of questioning, noting that defense counsel had challenged the credibility of McBee's testimony.

But I am telling you now, Jay Spurrier and Bill McBee are no choir boys. Both of them have admitted their participation in criminal activity; both of them are awaiting sentence right now. So I don't want you to think the United States is somehow embracing these guys and loving them and thinking they are somehow great. They did exactly what this man is charged with doing. And that is, engaging in extortion.

In closing, the government, immediately after discussing the credibility of several of its witnesses, reiterated: "I told you up front, Jay Spurrier, Bill McBee are no saints. They are engaged in the same d[e]spicable conduct as Don Blandford and they will be sentenced for that some day. But I don't want you to think for a minute that we're asking you to embrace them."

Blandford failed to object to the government's comments in both instances however and, thus, we review only for plain error. The plain error standard "authorizes the Courts of Appeals to correct only particularly egregious errors, those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Thame*, 846 F.2d 200, 204 (3d Cir.) (citing *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985)), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988). Far from being "particularly egregious errors," we conclude that the government's remarks during its opening and closing arguments went to the credibility of key witnesses, McBee among them.

■ The remaining example of alleged misconduct is, as the government concedes, the most problematic. During its direct examination of McBee, the government asked: "And you were also required to plead guilty to a felony offense on the matter arising out of your influencing breed-to-breed legislation, isn't that correct?" McBee responded: "Yes, sir." Upon defense counsel's objection, the court noted that the government had

violated a prior court instruction prohibiting the government from inquiring into the specifics of McBee's plea. Even if we were to assume that the government acted improperly in this instance, we still would not conclude that its conduct warrants the relief Blandford seeks. In this regard, we note that the district court substantially cured any prejudice to Blandford by instructing the jury that "[t]hese are matters that you may consider only for determining Mr. McBee's credibility. And not for determining the guilt or innocence of Mr. Blandford[.]"[25] As the Tenth Circuit has explained:

> "A codefendant's guilty plea may not be used as substantive evidence of a defendant's guilt.... If the codefendant testifies, however, either the government or the defense may elicit evidence of a guilty plea for the jury to consider in assessing the codefendant's credibility as a witness.... Because of the potential for prejudice, cautionary instructions limiting the jury's use of the guilty plea to permissible purposes are critical."

*United States v. Martinez–Nava*, 838 F.2d 411, 416 (10th Cir.1988) (refusing to grant new trial where district court promptly issued cautionary instructions) (quoting *United States v. Baez*, 703 F.2d 453, 455 (10th Cir. 1983)).

### III.

#### A.

■ Blandford's assignments of error are not limited to his conviction. Also subject to reversal, he asserts, are several of the district court's sentencing rulings. For instance, he argues that the district court erred by enhancing his offense level under the federal sentencing guidelines for his role in the offense. *See* U.S.S.G. § 3B1.1(c) ("If the defendant was an organizer, leader, manager, or supervisor in any criminal activity ... increase by 2 levels."). In fact, Blandford maintains that he should have been

---

**25.** Later, the court repeated, in essence, its earlier charge:

> You've also heard the testimony of Buel[ ] Guy, John J. Spurrier, III, and William McBee. You've also heard that before the trial these three men pled guilty to certain crimes. These guilty pleas were brought to your attention only as one way of helping you decide how believable their credibility was. Do not use them for any other purpose. They are not evidence of anything else.

granted a two-level reduction because he was merely a "minor participant" in Spurrier's and McBee's effort to block breed-to-breed legislation. *See id.* § 3B1.2(b) ("If the defendant was a minor participant in any criminal activity, decrease by 2 levels.").

Determining the nature and extent of the role Blandford played in the offense entails a factual inquiry, which we review only for clear error. *United States v. Graves,* 4 F.3d 450, 451 (6th Cir.1993). Finding no clear error here, we reject Blandford's assertion that he was entitled to the requested reduction. In this regard, we agree with the court's observation that "[i]f anything, he played the major role in the Hobbs Act [offense]." Nor do we disturb the court's decision to enhance Blandford's offense level under section 3B1.1(c). The court correctly determined that Blandford, as his own campaign treasurer, supervised the activities underlying the mail fraud predicate to his racketeering offense.[26]

### B.

 Blandford also challenges the court's decision to enhance his offense level for obstructing justice. *See* U.S.S.G. § 3C1.1 ("If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."). In justifying its decision to impose the disputed section 3C1.1 enhancement, the court cited false statements Blandford made to explain his criminal activities. First, the court observed, "Blandford testified that he didn't receive any money or didn't know what he received [from McBee]—5, 5,000, 5, 10—didn't even know what he received, said it could have been

maybe even fingernail clippers[.]"[27] This testimony, however, was graphically refuted by video tape footage showing Blandford placing $500 dollars into his pocket, removing it, and looking at it. The court surmised: "It's pretty obvious what he was looking at, at least from what I saw, so I think that when he said he didn't know how much money he got ... I think he misled the jury...." The court also noted Blandford's claim that he gave Guy money from his campaign fund because Guy had worked for it, when, in fact, the money was intended to compensate Guy for incurring tax liability as a result of Blandford's illegitimate loan to Foley. The court correctly determined that in both of these instances Blandford obstructed the administration of justice within the meaning of section 3C1.1.

### C.

 Blandford's third challenge to his sentence involves the district court's enhancement of Blandford's offense level for his abuse of a position of public trust. *See* U.S.S.G. § 3B1.3 ("If the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels."). As Application Note 1 to section 3B1.3 explains: "For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense...." The court articulated its reasoning behind imposing a section 3B1.3 enhancement in Blandford's case:

[W]e have a position of trust mentioned in which Mr. Blandford was his [own] campaign treasurer, and without—and that subsumes that the campaign treasurer is going to do things truthfully and file things

**26.** Blandford's assertion that Foley was not involved in the mail fraud scheme does not alter our conclusion that a section 3B1.1 enhancement is in order. That at least one other individual was involved, namely, Guy, is sufficient to trigger the enhancement. *See United States v. Kotoch,* 954 F.2d 340, 342 (6th Cir.1992).

**27.** Blandford contends that "this same testimony was the substance of Blandford's March 31 statement in Count 4 ... which the jury determined was a 'false explanation'. This enhancement

constituted both double-counting and multiple punishment." (Appellant's Brief at 43.) Blandford's argument, however, ignores that his interview with the FBI and his conduct at trial independently support, on the one hand, a conviction under 18 U.S.C. § 1001 and, on the other hand, an enhancement under U.S.S.G. § 3C1.1. They are, as the government deems them, "separate incidents occurring at separate times." (Appellee's Brief at 46.)

in a correct fashion. And fortunately, he disbursed campaign funds in a manner not consistent with law and then submitted a report saying that they had been, and that report went through the mail, so I think that that 2–point adjustment is appropriate in this particular circumstance.

Again, although Guy may have been the one actually filling out the reports, he did so only pursuant to Blandford's instructions. Stated simply, the court's conclusion that Blandford abused a position of public trust is not clearly erroneous. *See United States v. Williams,* 993 F.2d 1224, 1227 (6th Cir.1993) ("The district court's finding regarding the application of section 3B1.3 is a factual finding [reviewed for clear error].").

### D.

■ In his penultimate argument, Blandford asserts that the district court erred by imposing 64–month and 60–month terms of imprisonment for his convictions on Counts 2 and 4, respectively. The applicable sentencing ranges, Blandford maintains, were only 33–41 months for Count 2 and 0–6 months for Count 4. Notwithstanding Blandford's assertion, we find that the district court sentenced him in accordance with U.S.S.G. § 5G1.2, which provides in relevant part:

(b) Except as otherwise required by law (*see* § 5G1.1(a), (b)), the sentence imposed on each other count shall be the total punishment as determined in accordance with Part D of Chapter Three, and Part C of this Chapter.

(c) If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.

The Commentary to section 5G1.2 adds that:
The combined length of the sentences ("total punishment") is determined by the adjusted combined offense level. To the extent possible, the total punishment is to be imposed on each count. Sentences on all counts run concurrently, except as required to achieve the total sentence, or as required by law.

. . . .

Usually, at least one of the counts will have a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count. The sentence on each of the other counts will then be set at the lesser of the total punishment and the applicable statutory maximum and be made to run concurrently with all or part of the longest sentence.

Here, the court properly adhered to the dictates of section 5G1.2. Blandford's adjusted combined offense level was 64 months. "To the extent possible," this sentence should have been imposed on Counts 2 and 4. *See United States v. Newsome,* 998 F.2d 1571, 1581 (11th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 734, 126 L.Ed.2d 698 (1994). With regard to Count 4, however, imposing the same sentence was not possible given that the charge contained in the count carries with it a statutory maximum of 60 months imprisonment. The court thus correctly ordered the 60–month sentence to run concurrently with the 64–month sentence imposed on the RICO count. *See id.*

### E.

Finally, Blandford advances three arguments to contest the district court's decision to fine him $108,356 for the cost of his incarceration. The court imposed the fine pursuant to U.S.S.G. § 5E1.2(i), which states:

Notwithstanding of the provisions of subsection (c) of this section, but subject to the provisions of subsection (f) herein, the court shall impose an additional fine amount that is at least sufficient to pay the costs to the government of any imprisonment, probation, or supervised release ordered.

First, Blandford urges this court to adopt the Third Circuit's holding in *United States v. Spiropoulos,* 976 F.2d 155 (3d Cir.1992) (holding that section 5E1.2(i) is inconsistent with the Sentencing Reform Act and violates due process); *but see United States v. Turner,* 998 F.2d 534 (7th Cir.) (upholding cost-of-confinement fine against similar challenge), *cert. denied,* — U.S. ——, 114 S.Ct. 639, 126 L.Ed.2d 598 (1993); *United States v. Hagmann,* 950 F.2d 175 (5th Cir.1991)

(same), *cert. denied,* —— U.S. ——, 113 S.Ct. 108, 121 L.Ed.2d 66 (1992). Blandford did not, however, challenge the validity of section 5E1.2(i) at sentencing. In *United States v. Carrozza,* 4 F.3d 70 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994), the First Circuit, faced with a similar situation, stated:

> We do not find it appropriate to answer this question at the present time. First, [the defendant] did not object to his cost-of-imprisonment fine at the time of sentencing. Hence, the district court had no reason to focus on the issue, and we lack the benefit of its considered views. Absent plain error, we normally will not consider an issue raised for the first time on appeal. Because the fine issue is one which has divided our sister circuits, we cannot see that the district court's alleged error in assessing the § 5E1.2(i) fine was a "plain" one within the meaning of Fed. R.Crim.P. 52(b).

*Id.* at 84 (citations omitted). We, too, feel that it would inappropriate, under the circumstances of this case, to consider the validity of section 5E1.2(i).

■ Second, Blandford maintains that he is incapable of paying the fine. The guidelines place upon the defendant the burden of proving that he is unable to pay a fine. U.S.S.G. § 5E1.2(f). To bolster his claim, Blandford cites the presentence report, which determined that he had a net worth of $577,278 but a net monthly cash flow of only $8, as well as an accountant's analysis showing that his and his wife's joint total net worth, assuming the accuracy of the report's figures, was less than $150,000. While we acknowledge that Blandford's section 5E1.2(i) fine will create a financial strain for him and his family, once the court determines that the ability to pay does exist, the actual fine imposed "should always be sufficient to ensure that the fine taken together with other sanctions imposed, is punitive." *Id.* § 5E1.2(e). The fine, in other words, should amount to something more than merely a financial "slap on the wrist." Here, we are not persuaded that Blandford has satisfied his burden and, as such, we reject his argument premised on section 5E1.2(f).

In his last challenge to his fine, Blandford accuses the district court of "improperly attributing Blandford's net worth to criminal conduct." (Reply Brief at 24.) To support his accusation, Blandford quotes the following remarks made by the court during his sentencing hearing:

> And to think that giving somebody money to buy drinks, beer; things like that, that accumulates. Maybe that's where all that property came from. And that might answer the question, why would somebody sell out the trust imposed upon him. For financial remuneration is the answer that I think can be developed.

Our review of the court's remarks convinces us, however, that they go to Blandford's motivations and culpability, not his net worth.

For the foregoing reasons, the decision of the district court is **AFFIRMED** in all respects.

DAVID A. NELSON, Circuit Judge, concurring.

I concur generally in Judge Guy's very thorough opinion. I write separately, however, to express my understanding of the scope of the quid pro quo requirement in extortion cases that do not involve campaign contributions and to discuss the adequacy of the district court's instructions to the jury in this respect.

As I read Justice Stevens' plurality opinion in *Evans v. United States,* —— U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), it leaves little room for doubt that the *quid pro quo* requirement of *McCormick v. United States,* 500 U.S. 257, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991), is not limited to cases where all of the questionable funds go into the defendant's campaign coffers and none go into the defendant's own pocket. That was certainly Justice Kennedy's understanding: "Readers of today's opinion should have little difficulty in understanding that the rationale underlying the Court's holding applies not only in campaign contribution cases, but all § 1951 prosecutions." *Id.* —— U.S. at ——, 112 S.Ct. at 1894, Kennedy, J., concurring. If this interpretation is correct, we must consider how sharply focused the *quid pro quo* require-

ment is in a case where, as here, all of the money has gone into the defendant's own pocket. (In *Evans*, it appears, a $1,000 check went to the defendant's campaign fund, and $7,000 given in cash was retained for the defendant's personal use.)

Justice Stevens concluded that the jury instruction at issue in *Evans* satisfied the *quid pro quo* requirement "because the offense is completed at the time when the public official receives a payment in return for his agreement to perform *specific* official acts; fulfillment of the *quid pro quo* is not an element of the offense." *Evans,* —— U.S. at ——, 112 S.Ct. at 1889 (emphasis supplied). Summing up, Justice Stevens explained that "[w]e hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* I see no reason to doubt that the "official acts" referred to in the last sentence were the "specific official acts" referred to earlier.

Even outside the campaign contribution context, I take it, the *quid pro quo* requirement can be satisfied only where the payment has been accepted in exchange for a "specific" official act or a "specific" requested exercise of official power. That is what the district court told the jury in *Evans* ("if a public official demands or accepts money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance ... constitute[s] a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution," *id.* —— U.S. at ——, 112 S.Ct. at 1884), that is what the Eleventh Circuit held in affirming Mr. Evans' conviction "passive acceptance of a benefit by a public official *is* sufficient to form the basis of a Hobbs Act violation if the official knows that he is being offered the payment in exchange for a specific requested exercise of his official power," *id.,* quoting 910 F.2d 790, 796 (11th Cir.1990), and that is what Justice Stevens clearly had in mind when he wrote that "the offense is completed at the time when the public official receives a payment in return for his agreement to perform *specific* official

acts...." *Id.* —— U.S. at ——, 112 S.Ct. at 1889 (emphasis supplied).

In the case at bar, the defendant tendered a proposed jury instruction stating, among other things, that "[a]s used in these instructions 'wrongfully obtaining property from another ... under color of official right' means that Mr. Blandford knowingly and deliberately agreed to accept property from Mr. McBee or others ... in return for Mr. Blandford's promise to perform or not perform *specific* official acts or actions regarding proposed breed to breed legislation." (Emphasis supplied.) The instructions ultimately given by the district court omitted the word "specific." I believe it would have been preferable to include that term.

When given an opportunity to comment on the instructions drafted by the court, however, counsel for defendant Blandford did not make an issue of the court's omission of the word "specific." Counsel argued that *McCormick* and *Evans* require the government "to prove as a part of its case that mon[ey] or property ... was given in exchange for an agreement or promise to perform or refrain from performing *some official act*" (emphasis supplied), but in this context I see no meaningful difference between "some official act" and "an official act," the formulation adopted by the court. It was not plain error to omit the word "specific," and viewed in the context of the trial as a whole I am satisfied that any error was harmless.

I am strengthened in my conclusion on the latter point by the government's closing argument, given immediately after the court's delivery of its instructions to the jury. The government argued that money had been given to Mr. Blandford in connection with a specific piece of legislation affecting the harness industry—House Bill 749, as proposed by the Governor—and that defendant Blandford had to know that the money was being given to him in exchange for the absence of a breed-to-breed provision in that particular piece of legislation. (At the time the last payment was accepted, the record indicates, it would still technically have been possible for the thoroughbred interests to procure an amendment to the Governor's bill adding the

kind of breed-to-breed provision feared by the harness racing interests.)

In its opening statement to the jury, moreover, the government had explained that "[e]xtortion, as it is used in this trial, occurs when a public official, Mr. Blandford, accepts money to which he's not entitled, knowing that it is being given to him in exchange for a *specific* piece of legislation or a *specific* influence he can have." (Emphasis supplied.) The jury was told at the very outset that "this is what the United States is going to prove: Extortion, accepting a payment, knowing it's in return for a *specific* act." (Emphasis supplied.)

The government returned to this theme in the rebuttal that followed the defendant's closing argument. The government argued in rebuttal that Mr. Blandford received the money for a piece of legislation—House Bill 749—that potentially could have included a breed-to-breed provision, but did not in fact have such a provision. "And," the government told the jury, "he acknowledge[d] I took that money and I knew it was for the governor's bill."

I am satisfied that the jury was not misled, and I believe that keeping a breed-to-breed provision out of the Governor's bill, or ostensibly standing ready to try to do so, would be specific enough to satisfy the requirements of *McCormick* and *Evans*. Although I think that the omission of the word "specific" from the jury charge was unfortunate, I concur in the court's conclusion that a new trial is not required.

GORDON J. QUIST, District Judge, dissenting.

I concur in all respects except one with the opinion of Judge Guy and the concurring opinion of Judge Nelson. My sole dissent goes to what is required to establish a "pattern" for purposes of RICO.

The Supreme Court spelled out what was required to establish a pattern for purposes of RICO in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Surveying the legislative history, the Court said:

A pattern is not formed by "sporadic activity," and a person cannot be subjected to the sanctions of title IX simply for committing two widely separated and isolated criminal offenses. Instead, the term "pattern" itself requires the showing of a relationship between the predicates and of the threat of continuing activity. It is this factor of *continuity plus relationship* which combines to produce a pattern.

*Id.* at 239, 109 S.Ct. at 2900 (emphasis in original) (internal quotations and citations omitted). The Court turned to 18 U.S.C. § 3575(e) for a definition of what is required to show that predicate acts were related: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901. Continuity can be show by either "a closed period of repeated conduct, or ... past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902.

In attacking his RICO conviction, Blandford argues that the two predicate acts—the Hobbs Act conviction and the mail fraud—do not constitute a "pattern" sufficient to support a RICO conviction. Although Blandford argues that neither continuity nor relatedness were shown, the acts themselves and Blandford's comfort with using his office for personal ends suggest a threat of repetition. I thus agree with the majority opinion on the issue of continuity. My only disagreement is on the issue of the relatedness of the two predicate acts.

In *Vild v. Visconsi*, 956 F.2d 560 (6th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 99, 121 L.Ed.2d 59 (1992), this Court held that the pattern requirement was not satisfied in a RICO complaint involving Florida real estate because the two series of actions outlined in the complaint were not sufficiently related to each other. The first of the two involved a scheme to defraud plaintiff John Vild by allegedly inducing him to enter into a real estate marketing venture for a Florida resort club and then attempting to force him out of business. *Id.* at 563.

The second scheme involved alleged illegal solicitations that certain defendants made to induce customers to purchase interests in the club. *Id.* The court held that the two schemes had very different purposes, disparate results, different victims, and different means of commission. It also held "[t]hat some of the same participants engaged in both lines of conduct does not alter our conclusion that the predicate acts in the two schemes are unrelated." *Id.* at 568.

The dissent in *Vild,* like the majority in the case at bar, pointed out that the *H.J. Inc.* definition of relatedness used the disjunctive, which "indicates that the related requirement is met if the predicate acts are the same or similar in any of the enumerated ways." 956 F.2d at 571. The dissent concluded that the two schemes were related because they had the same participants—some of the defendants were involved in both schemes. *Id.*

In this case, the majority holds that Blandford's conviction under RICO is supported by a pattern in that both actions—accepting money for influencing legislation and converting campaign funds to personal use—are related in that they had as their purpose the use of public office for financial gain. The government charged Blandford with four predicate acts—the Hobbs Act violation, in which Blandford took money for himself, and three acts of mail fraud, all of which involved the use of campaign funds to award Blandford's assistants. If the jury had based its RICO conviction on more than one of the acts of mail fraud, there would be no question that the acts were related.

The jury, however, determined that only the Hobbs Act violation and one of the mail fraud allegations had been proved by a preponderance of the evidence. These acts are widely separated in time. In addition, the means of commission, the victims, and the results are dissimilar. The purpose can be described as the same only if it is described on a very general level as the use of public office for personal benefit. It cannot even be described as the use of public office for financial gain in that the mail fraud act provided Blandford's assistant, not himself, with financial gain. This general level of description is an insufficient basis for relatedness because almost every act of fraud or misuse of funds can be described as for this same general purpose—for personal benefit.

And I cannot conclude that there should be a different analysis because Mr. Blandford used a *public* office, as distinguished from, for example, a private company, to commit his criminal acts. This is not to say that misuse of public office can never provide the basis for finding criminal acts to be related. In this particular case, Blandford's post-election use of excess campaign funds to award an assistant did not involve misuse of the power of his office. The fact that Blandford used campaign funds instead of some other fund entrusted to him was incidental to the act. If, in addition to the Hobbs Act conviction, he had committed another act in which misuse of public power or position is an essential component, like election fraud or a second Hobbs Act violation, I would consider the acts related.

The question, it seems to me, is whether the criminal acts are related as distinguished from whether the vehicle for achieving those acts is the same. If all that is required is the same vehicle for the wrongful acts, i.e. the same defendants and a very general description of purpose, RICO's criminal charges and treble damages can be brought into play against any individual or company that engages in two entirely different fraudulent schemes. *See Menasco, Inc. v. Wasserman,* 886 F.2d 681, 685 (4th Cir.1989) ("If the pattern requirement has any force whatsoever, it is to prevent this type of ordinary commercial fraud from being transformed into a federal RICO claim"). This result would disregard the *H.J. Inc.* holding that "[a] pattern is not formed by 'sporadic activity,' and a person cannot be subjected to the sanctions of title IX simply for committing two widely separated and isolated criminal offenses." 492 U.S. at 239, 109 S.Ct. at 2900. Accordingly, I respectfully dissent.