**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0569n.06

**No. 11-3845**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Jun 04, 2012*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| BRIDGET MCCAFFERTY | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellant. | ) | |

Before:     **BOGGS and GRIFFIN, Circuit Judges; and BARZILAY, Judge.**[*]

**BOGGS, Circuit Judge.**  The prosecution of Bridget McCafferty, formerly a judge on the

Cuyahoga County Common Pleas Court, arose out of the high-profile public-corruption and bribery

case against James Dimora, formerly Cuyahoga County Commissioner and Cuyahoga County

Democratic Party Chairman.  Following a jury trial in which McCafferty was convicted of ten counts

of making false statements to FBI agents, in violation of 18 U.S.C. § 1001, she raises seven claims

on appeal.   First, that the district court improperly admitted testimony about ex parte

communications and the Ohio Code of Judicial Conduct, in violation of Fed. R. Evid. 404(b).

Second, that the district court erred in not playing a wiretap conversation during trial, in violation

of her right of confrontation under the Sixth Amendment.  Third, that the indictment was improper,

---

[*]The Honorable Judith M. Barzilay, Senior Judge, United States Court of International Trade,
sitting by designation.

as it did not set forth the objective truth claimed to be in contrast to her alleged false statements.

Fourth, that the district court erred in admitting a voice mail message into evidence. Fifth, that the

district court erred in admitting a statement of a co-conspirator. Sixth, that the district court erred

in refusing to dismiss certain counts or require the government to elect among multiplicitous counts.

Seventh, that the district court abused its discretion by varying upwards five levels in sentencing her.

Each claim is without merit. We affirm.

**I**

**A**

In 2007, the United States launched a wide-ranging investigation into public corruption in

Cuyahoga County, Ohio. Prosecutors sought and received authorization to wiretap nine phones.

Over the course of eight months, the government intercepted more than 44,000 conversations, and

seized "a small mountain" of documentary materials. The primary targets of the investigation were

Frank Russo, the County Auditor, and James Dimora, the County Commissioner and Democratic

Party Chairman, both of whom were ultimately indicted for public-corruption offenses.[1]

**B**

Intercepted conversations revealed that Dimora and Russo had contacted county judges

about pending cases, including then-Judge McCafferty. On September 23, 2008, FBI agents Curtis

---

[1] On March 9, 2012, Dimora was found guilty by a jury of 32 counts relating to the corruption probe, and is currently awaiting sentencing. 1:10-CR-387. Russo entered a guilty plea to an information on September 16, 2010, and was sentenced on December 16, 2010. 1:10-CR-384. On December 14, 2011, the United States filed a motion to reduce Russo's sentence pursuant to Rule 35(b)(1) of the Federal Rules of Criminal Procedure. That motion is currently pending.

and Oliver approached McCafferty in the driveway of her home. McCafferty invited the agents inside her home after the agents told her they had questions about the corruption investigation.

At first, McCafferty denied that Dimora had "ever attempted to influence any cases before her court," or "ever called her about a case," other than saying "she was doing a good job." Similarly, McCafferty denied that she had ever spoken to Russo "about any cases in court" or given him "any special consideration regarding cases." Next, the agents asked about Steven Pumper, a Dimora associate who was also a target of the corruption probe, and who later pleaded guilty to corruption charges. McCafferty had presided over a case between Pumper's company, DAS, and a subcontractor, Letter Perfect. The case arose from a construction contract involving the stadium of the Cleveland Browns. The case ultimately settled. McCafferty admitted that she called Pumper privately to ask if he was okay after the settlement conference, but this was her only contact with Pumper. McCafferty denied that she tried to "sway the negotiations for Steve Pumper."

After the agents reminded her that she could be subject for prosecution for making false statements to federal officers and RICO charges, McCafferty expressed concern about a false statement charge. When asked again if she had discussed any cases with Russo, her answer evolved, and she denied having any "recollection of that" or any recollection of trying to settle the case between DAS and Letter Perfect for less money. The agents terminated the interview because they believed McCafferty was lying about her contacts with Dimora, Russo, and Pumper. The interview lasted approximately ninety minutes.

**C**

On September 14, 2010, a federal grand jury returned an indictment against McCafferty on a single count of making false statements to FBI agents, in violation of 18 U.S.C. § 1001 (Count 25 of a multi-defendant indictment). After McCafferty's case was severed from the other parties, the grand jury returned a supplemental indictment charging McCafferty with ten counts of making false statements to FBI agents, in violation of 18 U.S.C. § 1001. Count 1 alleged that "MCCAFFERTY denied that Dimora attempted to influence her actions in any of the cases before her court." Count 2 alleged that "MCCAFFERTY denied that Dimora attempted to intervene in any of the cases before her court." Count 3 alleged that "MCCAFFERTY denied any involvement by Dimora in any of the cases before her court." Count 4 alleged that "MCCAFFERTY denied telling Pumper that she tried to settle the DAS case for less money." Count 5 alleged that "MCCAFFERTY denied trying to sway the DAS case settlement negotiations for Pumper." Count 6 alleged that "MCCAFFERTY denied trying to settle the DAS case so that Pumper would pay less." Count 7 alleged that "MCCAFFERTY denied that Frank Russo ever spoke to her about any of the cases in her court." Count 8 alleged that "MCCAFFERTY said that her only conversations with Russo about her court would have been Russo's remarks that he heard from attorneys that she was doing a good job as a judge." Count 9 alleged that "MCCAFFERTY said that the closest thing about a case that either Dimora or Russo would have said to her was that he (Dimora or Russo) knew an attorney who said that he (the attorney) was in MCCAFFERTY's court." Count 10 alleged that "MCCAFFERTY denied giving Frank Russo any special consideration with regard to any of the cases before her court."

McCafferty challenged the supplemental indictment on multiplicity grounds, and asserted that counts 1, 2, and 3 were multiplicitous concerning McCafferty and Dimora; counts 5 and 6 were multiplicitous concerning McCafferty and the DAS case; and counts 7, 8, and 9 were multiplicitous with respect to McCafferty and Russo. Count 4, alone, was not alleged to be multiplicitous of any other count. However, the court declined to require the government to elect between the allegedly multiplicitous counts, and ruled "that the government should be permitted to present its case, as charged, to the jury, given its representation that each of the statements set forth in the charges was denied by the defendant."

**D**

After a four-day trial, McCafferty was convicted, and the district court denied McCafferty's motion for a new trial and judgment of acquittal. The district court varied upward by five levels from the recommended Sentencing Guidelines range, and sentenced McCafferty to fourteen months of imprisonment.

**II**

**A**

During trial, the government offered Lori Brown, Chief Assistant at the Ohio Disciplinary Counsel, to testify about ex parte communications and Ohio's code of ethics for judges. McCafferty objected that the testimony was highly prejudicial under Fed. R. Evid. 403, not sufficiently probative, and inadmissible under Fed. R. Evid. 404(b). The district court ruled that the testimony would "aid the jury because my experience is that lay people do not realize the ethical considerations that judges have relative to talking about cases and oftentimes think there is nothing wrong with having ex parte

discussions." The court explained that, "without such expert testimony, it is unlikely that lay jurors would . . . understand why certain conduct by a judicial officer, such as engaging in ex parte conversations with parties, would be improper and unethical." The court concluded that Brown's testimony "would explain why an upstanding citizen, who holds a prestigious and respected position, would have incentive to lie to a federal agent." Brown testified about the principles embodied in the canons of ethics, and how violation of those canons "impairs [the] perception" that everyone "is entitled to a fair proceeding," and "affect[s] how the public perceives the judicial system."

On appeal, McCafferty challenges this ruling, arguing that evidence that discussed how bad "other acts" were should have been excluded. Further, McCafferty claims she had never denied having unethical ex parte communications. Both FBI agents testified that McCafferty told them, albeit after some nudging, that she spoke with Pumper during the pendency of the case, as well as after the settlement. Because McCafferty did not dispute that she had acknowledged ex parte communications, she asserts that Brown's testimony was not necessary for the jury to hear. McCafferty further alleges that the admission of this evidence was unfair and highly prejudicial, and substantially outweighed any probative value. Alternatively, McCafferty argues that, even if the evidence was admissible under Rule 404(b), Brown's testimony went too far: she was "permitted to explain the underlying principles and policies advanced by the canons—essentially allowing her to condemn McCafferty as an unfair, unprincipled judge." McCafferty moved for a mistrial after this evidence was introduced. This request was denied, though a limiting instruction was given, telling the jury that violation of the canons "was not a crime."

**B**

We review rulings of admissibility under Rule 404(b) for an abuse of discretion. *United States v. Mack*, 258 F.3d 548, 553 (6th Cir. 2001). Because "the draftsmen [of Rule 403] intended that the trial judge be given a very substantial discretion in balancing probative value . . . and unfair prejudice . . . , [this court has recognized that the district court] . . . should not be reversed simply because an appellate court believes that it would have decided the matter otherwise . . . ." *United States v. Zipkin*, 729 F.2d 384, 390 (6th Cir. 1984).

The district court correctly held that one of McCafferty's potential motives for lying to the FBI agents was to avoid sanctions for ex parte communications in violation of the code of ethics. Rule 404(b) states that evidence of a "wrong, or other act . . . may be admissible for another purpose, such as proving motive." In order for the jury to fully understand that possible motive, it was reasonable for the government to offer a witness to testify about how ex parte communications were considered under the judicial canons. The district court did not abuse its discretion by admitting the testimony to establish a possible motive for McCafferty to make false statements to the FBI agents.

However, as a threshold matter, it is unclear exactly what "other acts" Brown offered testimony about that could potentially be inadmissible. Granted, her discussion about the ethical implications of a judge engaging in ex parte communications tracked closely with McCafferty's course of conduct. However, Brown's testimony did not reference or mention any actual act McCafferty undertook. Rather her testimony was couched in hypotheticals. Rule 404(b) seems inapposite.

With respect to Rule 403, any prejudicial effect of the testimony is substantially outweighed by the probative value of explaining to the jury what the sanctions could be for a judge who engaged in improper ex parte communications—removal from office and disbarment. Fed. R. Evid. 403. The court instructed the jury that "[v]iolation of the canons is not a crime and the defendant, Bridget McCafferty, is not charged with any such crime. You may consider this evidence only as evidence of the defendant's motive and for no other purpose." With respect to the scope of Brown's statements about the principles and purposes of the code of ethics, the court's limiting instruction—which defense counsel helped to craft—was sufficient to cure any possible misconceptions about the relevancy of the testimony. Because juries are presumed to follow curative instructions, *United States v. Moreno*, 933 F.2d 362, 368 (6th Cir. 1991), McCafferty cannot show that the district court abused its discretion by admitting Brown's testimony.

**III**

**A**

During direct examination, Russo testified that he, McCafferty, Dimora, and Pumper spoke about the DAS case at a fund raiser in the Tremont area of Cleveland. As part of her defense, McCafferty sought to establish that this conversation occurred at a fund raiser for Brendan Sheehan, a judicial candidate, at the Fahrenheit restaurant in Tremont on May 29, 2008—three weeks after the case had settled. This would show that the conversation was not inappropriate, as the case had already been closed. In a wiretapped conversation recorded on May 28, 2008, Russo tells Dimora that he will go to Sheehan's fund raiser on May 29, 2008, and Dimora replies that he will join him.

This conversation—which occurred before the Sheehan fund raiser—does not refer to McCafferty or Pumper attending the fund raiser.

On cross-examination, Russo testified that the fund raiser where McCafferty discussed the DAS case may have been at the Fahrenheit restaurant and may have been for Sheehan, but he was not sure: "It could have been Brendan Sheehan's fund-raiser or [that of] a[n incumbent] judge. I think it could have been possibly at Fahrenheit, but I couldn't guarantee that I told them." He noted that "[t]hat was a year many judges were running. We had two or three fund-raisers that evening to go to."

The defense attempted to introduce the audio of a conversation between Russo and Dimora, recorded on May 28, 2008, and the government objected. The court ruled that it would not permit the recorded call to be played in court, but allowed the defense to show Russo a transcript of the phone call for the limited purpose of seeing whether it refreshed his recollection. Reading the transcript did not refresh his recollection, and Russo could not testify whether the fund raiser where the McCafferty conversation occurred was in fact Sheehan's fund raiser. The court did not permit the defense to play the audio.

**B**

McCafferty argues that her inability to play the recording while cross-examining Russo violated her Sixth Amendment right to confront the witness. The Sixth Amendment provides a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. Amend. VI. The Supreme Court has explained that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever

extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam).

"[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *accord United States v. Beverly*, 369 F.3d 516, 535 (6th Cir. 2004).

McCafferty had sufficient opportunity to cross-examine Russo, and to refresh his recollection about the fund raiser in question with the transcript. The district court's decision did not violate her right of confrontation, but simply prohibited her from playing a recording of a conversation—a conversation that Russo could not authenticate as related to the fund raiser in question attended by McCafferty.

Limits on cross-examination are reviewed for abuse of discretion. *United States v. Obiukwu*, 17 F.3d 816, 821 (6th Cir. 1994) (limits on cross-examination are consistent with the right to confront). While the defense could have impeached Russo based on any inconsistencies between his conversation with Dimora about attending the Sheehan fund raiser and his testimony that he did not remember the specific fund raiser at which the alleged conversation occurred, there was nothing in the transcript or recording that would have permitted any impeachment. Rather, the transcript only establishes that Russo and Dimora planned on going to Sheehan's fund raiser the next day—which is entirely consistent with Russo's testimony. The defense offered no evidence that McCafferty or Pumper were at the May 29, 2008 fund raiser by introducing any media accounts of

the event, or even calling Sheehan to testify (Sheehan was not on the defense's witness list). The district court did not abuse its discretion in excluding the audio recording of the phone call.

**IV**

The charges in the supplemental indictment referred to ten false statements that McCafferty made to FBI agents, but did not indicate what the truths were. McCafferty argues that the district court erred by not dismissing the supplemental indictment for its failure to state an offense. McCafferty argues that under *United States v. Eddy*, in a prosecution for perjury, an indictment alleging an offense premised on a defendant's false statements must set forth the objective truth in stark contrast in order to demonstrate their falsity. 737 F.2d 564, 567 (6th Cir. 1984). McCafferty contends that the supplemental indictment was insufficient because it failed to specify "the allegedly perjurious statements and the objective truth in stark contrast so that the claim of falsity is clear to all who read the charge."

McCafferty claims that a prosecution for perjury must be based on an objective falsity, which must be contrasted with an objective truth. This argument is flawed, both epistemologically and legally. Rather, a false statement is a false statement, in and of itself.

McCafferty disregards this court's leading precedent to the contrary, *United States v. Blandford*, 33 F.3d 685 (6th Cir. 1994). In *Eddy*, this court held that "in *perjury* cases, '[n]o guessing is tolerated [in the drafting of a perjury indictment] and the indictment must set out the allegedly perjurious statements and the objective truth in stark contrast so that the claim of falsity is clear to all who read the charge.'" 737 F.2d at 567 (emphasis added). In *Blandford*, by contrast,

we declined to "extend [its] ruling" in *Eddy* to prosecutions for making false statements to a federal

officers under 28 U.S.C. § 1001:

> Notwithstanding the fact that the indictment did not set forth the precise statements made by Blandford, we find the indictment satisfied the principles enunciated in *Gray*. The indictment alleged that Blandford had made material statements that were false or fraudulent and that he had done so knowingly and willfully. It set forth the nature of the statements as well as when and to whom they were made. It also specified that the statements pertained to an activity within the jurisdiction of a federal agency . . . . Count 4 of the indictment therefore presented Blandford with adequate notice of the offense for which he was charged.

33 F.3d at 704 (citations omitted). McCafferty provides no compelling arguments as to why

*Blandford* should be distinguished from her case.

The supplemental indictment "clearly state[s] that the defendant made material false

statements and that she did so 'knowingly and willfully.'" *District Ct. Op.* at 7. The supplemental

indictment further includes the date on which the statements were made, and notes that the

statements were made to FBI agents. McCafferty had more than "adequate notice of the offense for

which [s]he was charged." 33 F.3d at 704. The district court did not err in failing to dismiss the

supplemental indictments.

V

The FBI recorded a voicemail that McCafferty left for Russo, indicating that she had granted

a continuance to Joe O'Malley, an attorney appearing before her court in a criminal matter, so

O'Malley could provide assistance to Russo: so "Joe c[ould] be available for you to work on what

you need." The district court admitted the voicemail at trial. McCafferty challenged the introduction

of this evidence, contending that no allegation in the indictment concerned any case involving

O'Malley. McCafferty alleges that Russo had no interest in the matter in which O'Malley appeared, and that Russo did not ask McCafferty for a continuance. Thus, she concludes, this conduct does not fall within the ambit of Count 10 of the supplemental indictment.

This court reviews the decision to admit evidence for abuse of discretion. *United States v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996). In considering such claims, we "must view the evidence in the light most favorable to the government by maximizing the probative value of the evidence and minimizing its potential prejudice." *Ibid.* "[T]he prejudice to be weighed is the unfair prejudice caused by admission of the evidence. Evidence that is prejudicial only in the sense that it paints the defendant in a bad light is not unfairly prejudicial pursuant to Rule 403." *Ibid.*

Count 10 of the supplemental indictment was worded quite broadly: "MCCAFFERTY denied giving Frank Russo *any* special consideration with regard to *any* of the cases before her court." (emphasis added). This seems to cover any possible benefit given to O'Malley in a case in front of her that could have benefitted Russo—whether alluded to in the indictment, or not. Further the fact that McCafferty specifically told Russo about it, and noted how O'Malley could help him, suggests that there was some special consideration given. The district court did not abuse its discretion by introducing the recording.

## VI

The district court admitted a recording of a phone conversation between Pumper and Dimora—in which Dimora told Pumper, "I had a nice talk with . . . Bridget"—ruling that it was a statement of a co-conspirator, under Fed. R. Evid. 801(d)(2)(E). A district court may admit a co-conspirator's statements made in furtherance of a conspiracy where the government "show[s] by

a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant against whom the statement is offered was a member of the conspiracy; and (3) the statement was made in the course of and in furtherance of the conspiracy." *United States v. Moss*, 9 F.3d 543, 549 (6th Cir. 1993).

McCafferty complains that the government did not show the existence of a conspiracy under 18 U.S.C. §§ 1341 and 1349 or Ohio Rev. Code §§ 2913.02 and 2913.05. McCafferty argues that the government's evidence only demonstrated a scheme by Dimora, Russo, McCafferty, and others to deprive another of "honest services," but did not involve a bribery or kick-back scheme. Under the Supreme Court's opinion in *Skilling v. United States*, she argues, this proffer was insufficient to support the predicate conspiracy necessary to rely on the hearsay exception in Rule 801(d)(2)(E). 130 S. Ct. 2896 (2010).

The district court held *Skilling* was inapposite, and we agree. By tilting the negotiations towards Pumper in the DAS case, and inducing Letter Perfect to settle for a lower amount, the goal of the conspiracy was to "to deprive another, Letter Perfect, of property or money in violation of 18 U.S.C. § 1349," not honest services under 18 U.S.C. § 1346. *District Ct. Op.* at 3. Pressuring Letter Perfect during settlement talks did not merely deprive it of "honest services," but resulted in a direct loss of money through a corrupt scheme in which she participated. The district court did not err in admitting the statements of McCafferty's co-conspirators based on this conspiracy under federal law.

**VII**

McCafferty challenges the district court's decision not to require the government to elect between multiplicitous counts in the supplemental indictment. The district court chose to merge the counts only for purposes of sentencing. This court "may reverse [a district court's decision declining

to require the government to elect between multiplicitous counts] only for an abuse of discretion." *United States v. Throneburg*, 921 F.2d 654, 657 (6th Cir. 1990). The Supreme Court has instructed that the proper remedy for multiplicitous counts may include allowing the jury to consider all counts that are reasonably supported by the evidence and addressing any multiple-punishment issues at sentencing by merging overlapping convictions. *Ball v. United States*, 470 U.S. 856, 864-65 (1985).

Because all of the charges derived from a single 90-minute interview, the jury would have heard the same evidence, even if the government had chosen to bring fewer charges. Further, the court provided Sixth Circuit Pattern Jury Instruction 2.01A, requiring the jury to consider each charge separately, curing any potential prejudice. The district court did not abuse its discretion.

## VIII

### A

The district court determined that McCafferty's offense level was six, with a guideline range of 0-6 months. The court imposed an upward variance of five levels, raising McCafferty's offense level to eleven. With an offense level of eleven, the guideline range was 8-14 months. The court imposed sentence at the high end of the range—14 months. McCafferty argues that the sentence is substantively unreasonable, and that the district court abused its discretion by granting an upward variance of five levels.

### B

The court identified two justifications for its upward variance: McCafferty's "repeated false statements" to the FBI and her position as a judge. In explaining that McCafferty's "repeated false statements" justified an upward variance, the court noted that McCafferty was given "ten

opportunities to respond to the agents' questions." The court considered the fact that McCafferty was a judge—"[t]o have a sitting judge lie repeatedly to federal agents necessitates a sentence that is higher than the guidelines suggest." "For a sitting judge to engage in this conduct shakes the very core of our system of justice, a system that's built upon the integrity and honesty of the individuals who are given the privilege to serve. And the fact that she lied about improper conversations that she was having about cases on her docket makes her conduct even more egregious."

The court found "that an upward variance is warranted because a sentence within the guidelines is woefully inadequate and would substantially minimize the serious nature and impact of this defendant's conduct." The court concluded that a "five-level adjustment to an offense level 11 would present the court with a guideline range that would be sufficient, but certainly not greater than necessary, to comply with the purposes of sentencing." With that offense level, "the court finds that a high end sentence in this range will reflect the very serious nature of the defendant's offenses, will promote respect for the law, provide just punishment for the offense and will hopefully deter others from engaging in such conduct."

## C

McCafferty first argues that the court erred by relying on the fact that the agents asked her the same question a number of ways. Nothing prevents the district court, under 18 U.S.C. § 3553(a), from weighing all elements of her offense, including prevarication and repeatedly lying to FBI agents when questions were phrased differently. If anything, with each rephrased question, the agents gave McCafferty additional chances to tell the truth—she declined each offer. The district court properly

relied on McCafferty's repeatedly lying, in spite of the agents giving her multiple chances to be truthful.

Next, she argues that it was improper for the court to vary upward because McCafferty was a judge. This case is indeed extraordinary. For a sitting judge to knowingly lie to FBI agents after she had unethically steered negotiations in a case to benefit her associates is a shock to our system of justice and the rule of law. The district court was correct to note that the defendant's "history and characteristics"—including her vocation as a judge—was relevant for purposes of sentencing. U.S.S.G. § 3B1.3.

Finally, McCafferty argues that an increase in the guideline range from 0-6 months to 8-14 months, assuming a one-month sentence was imposed,[1] resulted in a 700% increase from the lower end of the guideline range, and by 133% from the upper end of the guideline range. This sentence, she contends, was substantively unreasonable. This court has held that "*Gall* 'rejects . . . an appellate rule that requires extraordinary circumstances to justify a sentence outside the Guidelines range' and disallows 'the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence[.]'" *United States v. Camiscione*, 591 F.3d 823, 832 (6th Cir. 2010) (quoting *Gall v. United States*, 552 U.S. 38, 47 (2007) (internal brackets and quotation marks omitted). Instead, *Gall* "'permits district and appellate courts to require some correlation between the extent of a variance and the justification for it'" *Ibid.* (quoting *United States v. Grossman*, 513 F.3d 592, 596 (6th Cir. 2008)). "Perhaps

----

[1] The percentage increase when starting from zero months would be infinite.

most importantly, *Gall* shows that the sentencing process involves an exercise in judgment, not a mathematical proof." *United States v. Davis*, 537 F.3d 611 (6th Cir. 2008). By explaining the severe nature of McCafferty's offense, and how it "shakes the very core of our system of justice," the district court established a proper rationale for the upward variance.

The sentence was not substantively unreasonable, and the upward variance was not an abuse of discretion.

**VIII**

The judgments and sentences of the district are AFFIRMED.